## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **SEACOR MARINE LLC** | **CIVIL ACTION NO.  24-2409** |
| **VERSUS** | **JUDGE VANCE** |
| **GOL, LLC** | **MAGISTRATE JUDGE DOSSIER** |

### SEACOR MARINE LLC'S MEMORANDUM IN OPPOSITION TO GOL, LLC'S MOTION FOR SUMMARY JUDGMENT

Now that SEACOR has finally been able to obtain GOL's corporate deposition, SEACOR agrees that summary judgment is appropriate—just not in GOL's favor.  Because GOL's own testimony in its deposition unequivocally demonstrates that GOL breached its fiduciary duties to SEACOR and that GOL has wrongfully misappropriated funds belonging to SEACOR, this Court should deny GOL's summary judgment and grant summary judgment in favor of SEACOR pursuant to Federal Rule of Civil Procedure 56(f).

This maritime commercial dispute arises from SEACOR's efforts to recover approximately $2.7 million that was misappropriated by its agent, GOL.  SEACOR invoiced GOL (who served as vessel broker) for $2.7 million in services performed by SEACOR's vessels for Cox Operating, LLC ("Cox"), a now-bankrupt oil and gas company.  GOL, in turn, invoiced Cox for those services. At the time Cox filed bankruptcy, it owed GOL approximately $24.8 million in unpaid invoices, *including* the $2.7 million in SEACOR invoices.  After Cox filed for bankruptcy, Cox and GOL made a deal.  Specifically, GOL agreed to continue providing vessel brokerage services to Cox's bankruptcy estate, in exchange for which Cox agreed to pay $13 million to GOL.  Cox and GOL specifically agreed that the funds were to be applied to unpaid invoices from GOL to Cox (which, again, included SEACOR's invoices).  Despite this, SEACOR received none of the $13 million payment.  Instead, as discussed more fully below, GOL diverted funds due to SEACOR to itself and its affiliates, even to one that did no work at all for Cox.

There can be no dispute that GOL breached its contractual obligations to SEACOR as well as its fiduciaries duties as SEACOR's agent.  GOL's own testimony, financial records and discovery responses show that of the $13 million GOL received from Cox, GOL either pocketed or "loaned" itself and its commonly-owned affiliates approximately $9 million, paid about $2.5 million to other vendors, and, remarkably, cannot account for another $1.6 million.  Moreover, evidence shows that until Cox filed for bankruptcy, GOL took little to no action to recover outstanding invoices from Cox, breaching GOL's contractual duty to take all reasonable efforts to collect funds due to SEACOR.  For these reasons, GOL's motion should be denied and the Court should grant summary judgment in SEACOR's favor.

## I.    Factual & Procedural Background

SEACOR Marine owns and operates vessels that provide a variety of services to the offshore oil and gas industry.  GOL and its affiliates are engaged in a similar line of business.  Insofar as this dispute is concerned, GOL acted as a broker to supply vessel services from its affiliates and other vessel owners to third parties.  In this agency capacity, GOL essentially subcontracted vessels owned by others (including GOL's affiliates) to GOL's oil and gas clients.

GOL is owned by three individuals.  Ronald ("Rec") Chaddock owns 50%; Joel Broussard owns 40%; and Todd Danos owns 10%.[1]  The three owners individually also own (in varying proportions) several affiliated companies.[2]  As relevant to this case, Chaddock owns 100% of REC Marine Logistics, LLC ("REC Marine").[3]  REC Marine and GOL share office space and GOL employees often provide operational support to REC Marine.[4]  Additionally, at the times relevant

---

[1] Exhibit 1, GOL Corporate Deposition, pp. 36:14–37:1.

[2] Exhibit 1, GOL Corporate Deposition, p. 44:3–20.

[3] Exhibit 1, GOL Corporate Deposition, p. 162:12–22.

[4] Exhibit 1, GOL Corporate Deposition, pp. 162:23–165:21.

to this dispute, Chaddock was president of GOL.[5]  Chaddock and Broussard are each 50% owners

in another company, RO Boats, LLC ("RO Boats").[6]  RO Boats also shares office space with GOL,

and they both have the same General Counsel.[7]  Danos separately owns 100% of Lafourche Tugs,

Inc. ("Lafourche Tugs").[8]  While GOL brokered vessels owned by both REC Marine and

Lafourche Tugs, GOL did not broker any RO Boats vessels to Cox.[9]

### A.    Brokerage Agreement

In 2018, GOL and SEACOR entered into a Brokerage Agreement.[10]  Under this agreement,

GOL agreed to serve as SEACOR's agent for the purpose of brokering vessel charters.  Although

GOL has resisted being characterized as an agent—likely due to the legal duties such a status

imposes—the Brokerage Agreement could not be clearer: "Operator [SEACOR] hereby appoints

Broker [GOL] as Operator's agent solely for the purpose of obtaining charters for Operator's

vessels."[11]  GOL primarily brokered SEACOR's liftboats to its customers because none of GOL's

affiliates owned liftboats.[12]

The Brokerage Agreement permitted GOL to obtain charters for SEACOR's vessels,

subject to SEACOR's consent.  Once a vessel was chartered pursuant to the agreement, charter

hire could be paid by the charterer either to GOL or directly to SEACOR, depending on the specific

---

[5] Exhibit 1, GOL Corporate Deposition, pp. 170:1-8.

[6] Exhibit 1, GOL Corporate Deposition, p. 215:5–6.

[7] Exhibit 1, GOL Corporate Deposition, pp. 217:12–218:8.

[8] Exhibit 1, GOL Corporate Deposition, pp. 183:17–184:10.

[9] Exhibit 1, GOL Corporate Deposition, pp. 215:15–216:2.

[10] Rec. Doc. 36-2, Brokerage Agreement, attached as Exhibit A to GOL's Motion for Summary Judgment.

[11] Rec. Doc. 36-2, at 1, Brokerage Agreement, ¶ 1.

[12] Exhibit 1, GOL Corporate Deposition, pp. 47:2–48:2.

3

arrangement.  The Agreement required GOL to "remit net charter hire (charter hire less Broker's fee) to Operator [SEACOR] within fifteen (15) business days after receipt of such charter hire from the Charterer."[13]  And while the Brokerage Agreement provided that GOL is not directly liable for any charterer's nonpayment of charter hire, it explicitly obligated GOL to "undertake all reasonable efforts to collect charter hire from the Charterer."[14]  Additionally, SEACOR "retain[ed] the right to act on its own behalf in order to collect unpaid invoices directly from the Charterer."[15]  But even if SEACOR independently attempts to collect directly from the Charterer, under the Brokerage Agreement, GOL still has the obligation to take all reasonable efforts to collect.[16]

In the fall of 2022, GOL presented SEACOR with an offer to charter two of SEACOR's vessels to Cox, an oil and gas exploration company with properties in the Gulf of Mexico. SEACOR agreed, and two of its vessels—the SEACOR HAWK and the SEACOR FEARLESS— provided services to Cox from September to December 2022.  Pursuant to their course of dealing, SEACOR invoiced GOL for those services, and GOL, in turn, invoiced Cox.  Those invoices, which totaled $2,697,899.50, went unpaid.[17]

### B.    Cox's Bankruptcy and Trade Agreement with GOL

In May 2023, Cox and several affiliates filed for bankruptcy protection in the Southern District of Texas.[18]  At the time of filing, Cox owed GOL approximately $24.8 million, referred

---

[13] Rec. Doc. 36-2, at 2, Brokerage Agreement, ¶ 4.C.

[14] Rec. Doc. 36-2, at 2, Brokerage Agreement, ¶ 4.D.

[15] Rec. Doc. 36-2, at 2–3, Brokerage Agreement, ¶ 4.D.

[16] Exhibit 1, GOL Corporate Deposition, pp. 68:6–69:5.

[17] For a list of the SEACOR's invoices at issue, see Rec. Doc. 36-2, at 12–17, attached as Exhibit B to GOL's Motion for Summary Judgment.

[18] *In re MLCJR, et al.*, No. 23-90324, Bankr. S.D. Tx., filed May 14, 2023.  The bankruptcy proceeding remains open.

to in a subsequent agreement between Cox and GOL as the Prepetition Claim.[19]  Notably, this Prepetition Claim included the $2.7 million that SEACOR had invoiced to GOL, as well as amounts for services provided by other third-party vessel owners and for work that GOL's affiliates had performed directly for Cox.[20]  In Cox's bankruptcy proceeding, GOL filed notices of its liens against Cox, and in support of each lien, GOL submitted copies of the invoices it had issued to Cox for the use of SEACOR's vessels.[21]

Shortly after Cox filed bankruptcy, Cox and GOL entered into a Trade Agreement.[22]  Under this agreement, in exchange for GOL's continued provision of post-bankruptcy services, Cox agreed to pay GOL $13 million toward the Prepetition Claim of $24.8 million.  SEACOR did not see the Trade Agreement until it compelled production of it from the bankruptcy trustee, but the document makes clear that GOL received and retained funds specifically attributable to Cox's prepetition debt to GOL, which specifically included SEACOR's invoices.  Although the Prepetition Claim included SEACOR's $2.7 million, GOL did not pay SEACOR any portion of the $13 million Trade Agreement payment.

A brief aside provides important context.  Before this suit was filed, on January 11, 2024, SEACOR issued a formal request to GOL for a "full and sworn" accounting pursuant to La. Civil Code Art. 3003.  SEACOR sought to determine how much Cox had paid to GOL and how GOL had disbursed those funds.  On January 25, 2024, GOL, through its counsel, refused to provide the

---

[19] Exhibit 2, Trade Agreement.

[20] Exhibit 1, GOL Corporate Deposition, pp. 134:9–19.

[21] Rec. Doc. 36-2, at 19, GOL's Notice of Perfection, Continuation, or Maintenance of Liens against Cox, attached as Exhibit C to GOL's Motion for Summary Judgment; *see also* Rec. Doc. 36-2, at 29–32, 38, 43–44, GOL's SEACOR Invoices attached to its Notice of Perfection, Continuation, or Maintenance of Liens against Cox.

[22] Exhibit 2, Trade Agreement.

PD.49964439.5

requested accounting, claiming that its post-bankruptcy dealings with Cox were confidential and could not be disclosed. When SEACOR later obtained a copy of the Trade Agreement, it became clear why GOL had gone to such lengths to suppress it—*GOL had been paid for SEACOR's work* but elected to keep the money for itself and its affiliates instead of disbursing it to SEACOR, as it was contractually obligated to do.

Unable to obtain an accounting from GOL, SEACOR filed this lawsuit. In December 2024, within days of the opening of discovery, SEACOR served written discovery requests on GOL. GOL did not provide substantive responses to that discovery until SEACOR filed, and this Court granted, a motion to compel.[23] Once GOL finally provided discovery responses (after the Court's deadline to do so), SEACOR finally began to learn why GOL had gone to such lengths to conceal the facts related to the Trade Agreement payment. Stated simply, GOL relied on SEACOR invoices to enhance the amount of its claim against Cox, but when payment was made by Cox, GOL kept nearly all of that payment for itself and its affiliates and forwarded none to SEACOR.

Because GOL relied on SEACOR's invoices to bolster and increase the amount of its Prepetition Claim, SEACOR should have received its share of the Cox payment. Paragraph 4 of the Trade Agreement contemplates this, spelling out how the Payment Amount was to be applied. After addressing a first category of priority that is not relevant here, the Agreement directs that the funds be applied "to any amount secured by a lien."[24] GOL expressly admitted in its corporate deposition that SEACOR's invoices expressly fall within the category of "amount[s] secured by a lien."[25] Despite this clear language and admission, GOL made no payment whatsoever to

---

[23] *See* Rec. Doc. 10 (Motion to Compel); Rec. Doc. 16 (Order granting Motion to Compel).

[24] Exhibit 2, Trade Agreement, ¶ 4.

[25] Exhibit 1, GOL Corporate Deposition, pp. 133:22–134:3.

SEACOR out of the Payment Amount from Cox.  From the outset of the dispute, SEACOR simply wanted to ascertain what happened to the Payment Amount.  Now we know.

Instead of paying SEACOR a portion of what it received, GOL disbursed the Payment Amount by either paying or "loaning" funds directly to itself or companies under shared ownership, or by paying other vendors.   SEACOR was paid nothing.  According to GOL's own records and discovery responses, of the $13 million it received—based in part on SEACOR's invoices—most was paid to GOL's commonly owned affiliates.  For example, REC Marine—fully owned by GOL owner Rec Chaddock (who was also President of GOL at the time)—received $7,800,000, *which was $1,509,576.89 <u>more</u> than Rec Marine's portion of the Prepetition Claim ($6,290,423.11),* resulting in a recovery rate of 124%.[26]

Lafourche Tugs, a GOL affiliated entity owned by GOL co-owner Todd Danos, was paid $275,000 against invoices totaling $291,876 (a 94% recovery rate) and also received a "loan" from GOL in the amount of $463,288.[27]  This loan was not documented by any promissory note, there were no specific terms of the loan, the loan has not been repaid, and there is no term or concrete plan to repay the loan.[28]  It is, in other words and by all outward appearances, a sham.

That is not the only indefensible allocation of the Payment Amount by GOL.   RO Boats, the GOL affiliate owned by GOL co-owners Chaddock and Broussard, received a "loan" of

---

[26] Exhibit 1, GOL Corporate Deposition, p. 161:20–25 ($2.8 million direct payment), pp. 176:18–177:6 ($5 million loan); Exhibit 3, Expert Report of Holly Sharp, p. 24; *see also* Rec. Doc. 36-2, at 117–18, GOL's Supplemental Answer to Interrogatory No. 4.  Ms. Sharp's expert report is admissible on summary judgment because it reflects the opinions that she will offer in testimony at trial. *Patel v. Texas Tech Univ.*, 941 F.3d 743, 746 (5th Cir. 2019).

[27] Exhibit 1, GOL Corporate Deposition, p. 181:20–24; Exhibit 3, Expert Report of Holly Sharp, p. 20; *see also* Rec. Doc. 36-2, at 118, GOL's Supplemental Answer to Interrogatory No. 4.

[28] Exhibit 1, GOL Corporate Deposition, pp. 177:8–178:2.

PD.49964439.5

$495,000 from GOL out of the Cox payment.[29]  Remarkably, RO Boats provided no services whatsoever to Cox prepetition and therefore had no rights whatsoever to share in the Payment Amount.  GOL's corporate representative admitted that RO Boats did not "supply services to Cox prepetition," and that he  was "[n]ot positive" about whether RO Boats supplied "services to Cox post-petition."[30]  Nevertheless, GOL brazenly "loaned" nearly a half million dollars to RO Boats while paying SEACOR nothing.[31]  Clearly, the amounts paid to RO Boats not only violate the Trade Agreement's express instructions that the payments be applied to the Prepetition Claim, but also violate GOL's contractual and fiduciary duty to use all reasonable efforts to collect funds due SEACOR.

Other vendors whose invoices were included in the Prepetition Claim but who do not share a corporate address with GOL (excluding SEACOR) were paid $2,323,243.42.[32]  Notably, none of these unrelated vendors received more than 42% of their respective invoice amounts.[33]

Finally, $1,643,469 of the $13 million is unaccounted for and cannot be traced to any recipient based on the records produced.[34]

Because GOL's own evidence shows that its work (including that of its affiliates) comprised approximately $6.5 million of the $24.8 million Prepetition Claim, and because GOL

---

[29] Exhibit 1, GOL Corporate Deposition, p. 212:11–20; Exhibit 3, Expert Report of Holly Sharp, p. 22; *see also* Rec. Doc. 36-2, at 118, GOL's Supplemental Answer to Interrogatory No. 4.

[30] Exhibit 1, GOL Corporate Deposition, pp. 215:15–216:2.

[31] Despite being the general counsel of both GOL and RO Boats, GOL's corporate representative purportedly does not know whether the RO Boats loan is documented.  GOL Corporate Deposition, pp. 219:10–220:7.

[32] Exhibit 3, Expert Report of Holly Sharp, p. 14; *see also* Rec. Doc. 36-2, at 118, GOL's Supplemental Answer to Interrogatory No. 4.

[33] Exhibit 3, Expert Report of Holly Sharp, p. 24.

[34] Exhibit 3, Expert Report of Holly Sharp, pp. 15, 24; Exhibit 1, GOL Corporate Deposition, p. 174:4–5.

paid itself and its affiliates approximately $9 million, obviously far more than what they were owed, there can be no dispute of fact but that GOL has breached its legal obligations and that SEACOR is entitled to a judgment as a matter of law.

## II.    Argument & Analysis

GOL's motion for summary judgment should be denied because its own evidence shows that it breached its contractual and agency duties under the Brokerage Agreement. The agreement explicitly required GOL to act as SEACOR's agent, to make all reasonable efforts to collect on SEACOR's invoices, and to remit payments promptly. GOL's self-dealing and misallocation of funds received from Cox on SEACOR's invoices constitute clear breaches of duty, both contractually and under agency law. GOL's reliance on the separate bankruptcy proceedings and its status as a critical vendor does not absolve it of its obligations to SEACOR. Because the facts unequivocally demonstrate that GOL violated its duties to SEACOR, summary judgment should be granted to SEACOR, not GOL.

### A.    Summary Judgment Standard

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are "material" if proof of their resolution in favor of one party might affect the outcome of the action under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There remains a "genuine issue for trial" if "a rational trier of fact," viewing the record as a whole, could "find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the court must resolve all ambiguities, draw all permissible inferences, and view the evidence in the light most favorable to the nonmoving party. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

9

### B.    Summary Judgment in favor of SEACOR under Rule 56(f).

The Court may *sua sponte* grant summary judgment in favor of a nonmoving party under Federal Rule of Civil Procedure 56(f).  Fed. R. Civ. P. 56(f) (a court may "grant summary judgment for a nonmovant" after giving the nonmovant "notice and a reasonable time to respond"); *Atkins v. Salazar*, 677 F.3d 667, 681 (5th Cir. 2011) (affirming district court's grant of summary judgment *sua sponte* without formal notice to the litigants because the party against whom summary judgment was granted "was aware [the legal issue] was at play and had a full opportunity to argue against it and present whatever evidence he had").  Summary judgment in favor of a nonmoving party is particularly appropriate where the "legal issue was fully briefed" and the moving party was "on notice that the Court" would interpret a contract "when deciding their motion for summary judgment."  *KFC Corp. v. Iron Horse of Metairie Rd., LLC*, No. 16-16791, 2019 WL 13225874, at *7 (E.D. La. June 7, 2019) (Vance, J.).  As long as both parties "had the opportunity to present evidence and arguments in support of their position," summary judgment in favor of the nonmoving party pursuant to Rule 56(f) is proper.  *Id.*

The Rule 56(f) standard is clearly met here.  GOL was well aware that the Court would have to interpret the Brokerage Agreement in order to rule on its own Motion for Summary Judgment, "because that is what [GOL] asked the Court to do."  *See id.*  GOL has thus "fully briefed" this issue and "had the opportunity to present evidence and arguments in support of their position" on how the Brokerage Agreement should be interpreted in light of the facts.  *Id.*  Accordingly, summary judgment in favor of SEACOR, the nonmoving party, is proper under Rule 56(f) for all the reasons discussed below.

PD.49964439.5

### C.  GOL breached its obligations and agency duties owed under the Brokerage Agreement.

Summary judgment is appropriate in favor of SEACOR because the evidence demonstrates that GOL breached its contractual and agency duties by failing to make reasonable efforts to collect on SEACOR's invoices, and by withholding payment of collected funds and instead paying itself and its affiliates.  The Brokerage Agreement between SEACOR and GOL expressly established GOL as SEACOR's agent for the purpose of brokering vessel charters.  The Brokerage Agreement could not be clearer in imposing agency duties:  "Operator [SEACOR] hereby appoints Broker [GOL] as Operator's agent solely for the purpose of obtaining charters for Operator's vessels."[35] The Agreement further required GOL to "remit net charter hire (charter hire less Broker's fee) to Operator within fifteen (15) business days after receipt of such charter hire from the Charterer."[36] While GOL was not directly liable for a charterer's nonpayment, it was explicitly obligated to "undertake all reasonable efforts to collect charter hire from the Charterer."[37]

These provisions imposed two distinct duties on GOL.  First, GOL was required to use reasonable efforts to collect charter hire on SEACOR's behalf.  Second, GOL was obligated to promptly remit any funds collected that were attributable to SEACOR's invoices.  GOL's own evidence shows without any doubt that GOL failed on both counts.

### 1.  The law on breach of contract and agency.

To prove breach of contract in a maritime case, the plaintiff must demonstrate the following elements: "(1) contract; (2) breach of that contract; and (3) damages."  *FEC Heliports, LLC v. Hornbeck Offshore Ops., LLC*, 2016 WL 5678557, at *5 (E.D. La. Oct. 3, 2016).  A contract

---

[35] Rec. Doc. 36-2, at 1, Brokerage Agreement, ¶ 1.

[36] Rec. Doc. 36-2, at 2, Brokerage Agreement, ¶ 4.C.

[37] Rec. Doc. 36-2, at 2, Brokerage Agreement, ¶ 4.D.

PD.49964439.5

governed by federal maritime law, "should be read as a whole and its words given their plain meaning unless the provision is ambiguous." *LLOG Expl. Co. v. Signet Mar. Corp.*, 673 F. App'x 422, 425 (5th Cir. 2016).  If the "written instrument" in a maritime contract "is so worded that it can be given a certain definite legal meaning or interpretation," then the Court should so "construe the contract as a matter of law." *Breaux v. Halliburton Energy Servs.*, 562 F.3d 358, 364 (5th Cir. 2009).

Beyond its basic obligation as a party to a contract, GOL, as SEACOR's agent, owed heightened legal duties under both Louisiana law and general maritime law.  To be clear, there is no distinct maritime law of agency.  As the Court is well aware, where general maritime law does not provide a specific rule, admiralty courts borrow from state law, provided it does not conflict with established maritime principles.  *See E. River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864–65 (1986) (explaining that general maritime law is derived from state and federal sources and "is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules"); 1 Thomas J. Schoenbaum, Admiralty & Mar. Law § 4-2 (5th ed. 2014). Numerous federal admiralty cases have applied Louisiana's agency law to maritime cases governed by contracts entered in Louisiana.  *See, e.g.*, *RSDC Holdings, LLC v. M.G. Mayer Yacht Servs., Inc.*, 2018 WL 6169265, at *3 (E.D. La. Nov. 26, 2018) (applying Louisiana agency law to determine whether an agent had authority to create a maritime lien on a vessel); *S. Oil of La., LLC v. All. Offshore, L.L.C.*, 2024 WL 3044697, at *8 (E.D. La. June 18, 2024) (permitting a party in an admiralty case to assert a claim under Louisiana's agency law).  Other courts have indicated that the Restatement (Second) of Agency applies in maritime cases. *See Cross Chartering N.V. v. R.I.P.C. (Trinidad), Ltd.*, 2005 WL 2921645, at *8 (S.D. Tex. Nov. 2, 2005) (applying Restatement).

Ultimately, the choice between Louisiana law and the Restatement is immaterial because both establish that GOL owed special, heightened, fiduciary duties to SEACOR. Both sources recognize two fundamental agency principles that are central to the issues before the Court: first, the agent's duty to account to the principal for its actions, and second, the agent's general duty of loyalty to the principal.

Section 382 of the Restatement provides that "unless otherwise agreed, an agent is subject to a duty to keep, and render to his principal, an account of money or other things which he has received or paid out on behalf of the principal." Restatement (Second) of Agency § 382 (1958). This means the agent is obligated to provide an accounting upon the principal's demand, both during and upon termination of the agency relationship. The Restatement also imposes a general duty of care in favor of the principal, including a specific rule for agents engaged in collection activities: "Unless otherwise agreed, an agent employed to collect from others goods or money due the principal has a duty of using reasonable care and skill in making such collections in accordance with the directions of the principal." Restatement (Second) of Agency § 426 (1958). In addition, the Restatement addresses conflicts of interest: "If, without the violation of a duty on the part of an agent, a situation arises in which the principal's affairs conflict with those of the agent, the agent has a duty to deal fairly in the protection of the principal's interests." Restatement (Second) of Agency § 393, cmt. d (1958).

Finally, the Restatement recognizes a duty of loyalty owed by the agent to the principal. That is, "an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." Restatement (Second) of Agency § 387 (1958). An agent's "primary obligation imposed . . . by the fiduciary duty of loyalty is to avoid self-dealing with regard to the business of the principal. Accordingly, an agent may not take part in any

transaction adverse to the interests of the principal without obtaining the principal's permission, after full disclosure of all facts that might affect the principal's decision." *United States v. State Farm Fire & Cas. Co.*, 2016 WL 3034326, at *9–10 (S.D. Miss. May 27, 2016); *see also Brown v. Slenker*, 220 F.3d 411, 424 (5th Cir. 2000) ("[I]t is well-settled that an agent is a fiduciary with respect to the matters within the scope of his agency.").

Louisiana law is equally clear. Louisiana's law of agency uses the term "mandate" instead of "agency" and "mandatary" instead of "agent," but the substantive rules mirror those of the Restatement. The Fifth Circuit has held that under Louisiana law, "a mandatary owes fiduciary duties to the principal." *D & J Tire, Inc. v. Hercules Tire & Rubber Co.*, 598 F.3d 200, 207 (5th Cir. 2010). While the precise scope of the mandatary's duty "depends upon the facts and circumstances of the case and the relationship of the parties," a mandatary must "disclose to his principal all facts relating to his principal's affair." *Id.* (citation omitted). The duty of loyalty is equally clear: "A mandatary's duty of loyalty encompasses the duty to act with complete candor with one's principal while engaging in his business or acting for him." *Woodward v. Steed*, 28,676 (La. App. 2 Cir. 9/25/96), 680 So. 2d 1320, 1327. "The mandatary cannot take any advantage his position may give him to speculate for his gain." *Id.* at 1325.

So, whether applying Louisiana law or the Restatement through general maritime law, GOL was obligated to act as a fiduciary, provide a full accounting upon request, and avoid conflicts of interest or actions adverse to SEACOR's interests. The facts show that GOL has utterly failed to meet these legal standards.

### 2.    GOL's breach of its duties as agent

There is no question that GOL failed to undertake "all reasonable efforts" to collect on SEACOR's invoices from Cox. The only evidence GOL points to in support of its purported

"reasonable" efforts is the filing of liens against Cox in the bankruptcy proceedings. However, there were significant other steps that GOL should have taken to collect on SEACOR's invoices prior to the bankruptcy. Evidence reveals a total lack of action by GOL to recover on SEACOR's invoices, and merely filing a claim in bankruptcy proceedings is not sufficient to satisfy GOL's contractual obligation to use "all reasonable efforts."

At worst, there are fact questions that warrant denying GOL's motion for summary judgment. The Fifth Circuit has consistently held that whether a party has met its "contractual best efforts obligation . . . is usually a question of fact because it is heavily dependent upon the particular circumstances of the case." *Frew v. Janek*, 820 F.3d 715, 728 (5th Cir. 2016); *see also, e.g., Mieco, L.L.C. v. Pioneer Nat. Res. USA, Inc.*, 109 F.4th 710, 727–28 (5th Cir. 2024) ("But fact disputes remain as to whether [defendant] exercised reasonable efforts to avoid Winter Storm Uri's impact on its ability to perform under the contract."). And courts in this district have followed suit. *See, e.g., Gulf Offshore Logistics, L.L.C. v. Seiran Expl. & Prod. Co.*, 2015 WL 1125140, at *5 n.60 (E.D. La. Mar. 12, 2015) ("The Court notes that 'what will constitute reasonable efforts under a contract expressly or impliedly calling for them is largely a question of fact, and entails a showing of activity reasonably calculated to obtain the results intended by the parties.'"; *see also L.A. Colo, LLC v. Bay Bridge Tex., LLC*, 2017 WL 10810261, at *4 (S.D. Tex. May 1, 2017) (noting that whether a party adequately performed under a contract "is assessed by an objective standard of reasonableness," an inquiry that "is generally a question of fact" (citation modified)). This Court should likewise find that whether GOL satisfied its "contractual best efforts obligation" is a fact-intensive question "dependent upon the particular circumstances of the case," and is best left for the trier of fact. *See Frew*, 820 F.3d at 728; *Mieco*, 109 F.4th at 727–28.

GOL's contention that SEACOR cannot prove how additional "efforts" would have "changed the outcome" misses the point.[38]  The issue is not only whether GOL used reasonable efforts to collect from Cox, but also whether GOL properly remitted to SEACOR the funds it did collect.

But even if a fact dispute remains as to GOL's collection efforts, there is no dispute that GOL breached the contract and its fiduciary obligations when it received substantial funds from Cox—funds that were intended, in part, to satisfy SEACOR's unpaid invoices—and failed to remit any portion to SEACOR.  This failure constitutes a clear breach of GOL's contractual and agency duties, which warrants summary judgment in SEACOR's favor.

To avoid this conclusion, GOL argues that it is "verifiably false" that "at least a portion of" Cox's $13 million Payment Amount "was intended to satisfy the amount owed by Cox to SEACOR for unpaid charter hire."[39]  GOL has not, however, offered any evidence that would "verify" the falsity of this allegation.  In any case, the argument that the Payment Amount reflected in the Trade Agreement should not apply to SEACOR's invoices ignores the express terms of the Trade Agreement.  The Trade Agreement explicitly provides that Cox was paying $13 million "towards GOL's Prepetition Claim."[40] And, as noted above, the Prepetition Claim undisputedly included SEACOR's unpaid invoices.[41]  That should be the end of the matter as it shows that GOL used SEACOR's invoices to increase the amount of the Prepetition Claim but then refused to share to proceeds of the Payment Amount paid to satisfy that very claim.

---

[38] Rec. Doc. 36-1, at 8, GOL's Motion for Summary Judgment.

[39] Rec. Doc. 36-1, at 10, GOL's Motion for Summary Judgment.

[40] According to GOL, there is no communication or documentation between Cox and GOL, other than the Trade Agreement, instructing to which invoices the Payment Amount should be applied.  Exhibit 1, GOL Corporate Deposition, pp. 136:10–139:2.

[41] Exhibit 2, Trade Agreement.

16

Paragraph 4 of the Trade Agreement governs the application of the Payment Amount in this case. After addressing a first category of priority that is not relevant here, the Agreement directs that funds be applied "to any amount secured by a lien."[42] GOL expressly admitted in its corporate deposition that SEACOR's invoices expressly fall within the category of "amount[s] secured by a lien."[43]

As noted above, despite GOL's reliance on SEACOR's invoices to support the Prepetition Claim and secure a larger recovery from Cox, GOL paid SEACOR nothing from the $13 million it received. Instead, GOL distributed the bulk of the funds to itself and its affiliates, made some payments to unrelated vendors (none of whom received more than 42% of their invoice amounts), and left $1.6 million unaccounted for. GOL admits that it paid or loaned (without any plan to repay) over $9 million (about 70%) of the Cox payment to companies wholly owned by GOL's owners.[44] Remarkably, RO Boats, the GOL affiliate owned by Chaddock and Broussard, received a loan of $495,000 even though RO Boats has never provided *any* services to Cox, either pre- or post-petition.[45] Thus, it should be obvious that RO Boats was never entitled to any portion of the Trade Agreement payment, but GOL directed those funds to its commonly-owned affiliates nonetheless.

SEACOR, by contrast, received nothing. This type of "self-dealing" disregards GOL's fiduciary duty to act with "complete candor with [SEACOR] while engaging in his business or acting for him." *Woodward*, 680 So. 2d at 1327; *see also State Farm Fire & Cas. Co.*, 2016 WL 3034326, at *9–10. GOL instead chose to take advantage of its fiduciary position "to speculate

---

[42] Exhibit 2, Trade Agreement, ¶ 4.

[43] Exhibit 1, GOL Corporate Deposition, pp. 133:22–134:3.

[44] Exhibit 1, GOL Corporate Deposition, pp. 161:20–25, 176:18–177:6, 181:20–24, 212:11–20.

[45] Exhibit 1, GOL Corporate Deposition, pp. 215:15–216:2.

for [its own] gain." *Id.* at 1325. This conduct is indefensible under the plain language of both the Brokerage Agreement and the Trade Agreement. GOL's obligation was not merely to attempt collection, but to remit to SEACOR its share of any funds actually collected for invoices that formed part of GOL's claim against Cox. By failing to do so, GOL breached both its contractual and fiduciary duties as SEACOR's agent. GOL's refusal to pay SEACOR any portion of the funds it collected from Cox—funds that were indisputably based in part on SEACOR's invoices—constitutes a clear and material breach of the Brokerage Agreement and GOL's fiduciary duties. Therefore, based on clear evidence of GOL's breaches, this Court should deny GOL's motion for summary judgment and grant summary judgment in SEACOR's favor.

In terms of damages, the report of SEACOR's forensic accounting expert Holly Sharp shows that, if GOL had applied the Trade Agreement payment to the oldest GOL invoice first, then all of SEACOR's invoices (save its final invoice) would have been paid in full.[46] GOL has admitted that such an application method is reasonable.[47] Under that reasonable application, SEACOR would have been paid **$2,455,250.64** and that is the amount that this Court should award to SEACOR.

### D.    GOL's arguments to the contrary are unavailing.

GOL's counterarguments fundamentally overlook its fiduciary obligations under the Brokerage Agreement. GOL first contends that SEACOR improperly "conflates Cox's nonpayment with a failure by GOL to take reasonable efforts to collect past due amounts."[48] But Cox's original nonpayment did not absolve GOL of its *twofold* obligations under the Brokerage

---

[46] Exhibit 3, Expert Report of Holly Sharp, at Schedule 4.

[47] Exhibit 1, GOL Corporate Deposition, p. 85:4–16.

[48] Rec. Doc. 36-1, at 6, GOL's Motion for Summary Judgment.

Agreement:  (1) to undertake all reasonable efforts to collect charter hire from the charterer, and (2) to promptly remit to SEACOR any funds collected that were attributable to SEACOR's invoices.  In this case, GOL did not merely attempt to collect, it *actually collected* payment on SEACOR's invoices when Cox "agree[d] to pay $13,000,000 towards [the] Prepetition Claim."[49]

Once GOL received funds based in part on SEACOR's invoices, it was contractually and as a matter of agency law required to turn over SEACOR's share.  GOL's failure to pay SEACOR anything from the $13 million payment constitutes a breach of both its contractual and fiduciary obligations as SEACOR's agent.

GOL's reliance on the "pay-if-paid" clause in the Brokerage Agreement is also misplaced because GOL was, in fact, paid.[50]  The pay-if-paid provision in the Brokerage Agreement may shift the risk of non-payment from the broker (GOL) to SEACOR, but that risk is irrelevant once payment is actually received.  And the non-payment by Cox does not vitiate GOL's independent duty to use all reasonable efforts to get Cox to pay.  Here, GOL received $13 million from Cox, a payment that was based on SEACOR's invoices.  GOL's argument is akin to a contractor using a subcontractor's invoices to support a claim against a project owner, collecting payment, and then refusing to pay the subcontractor.  The pay-if-paid clause does not authorize GOL to retain funds owed to SEACOR after GOL has actually collected those funds.

In sum, GOL's arguments ignore the clear contractual and fiduciary duties imposed by the Brokerage Agreement and agency law—particularly the duties to make all reasonable efforts to collect, to remit what was collected, and to avoid self-dealing.  The record demonstrates that GOL collected funds based on SEACOR's invoices, but only after inadequate and belated efforts, and

---

[49] Rec. Doc. 23-2, at 42, Trade Agreement, p. 1.

[50] Rec. Doc. 36-1, at 7–8, GOL's Motion for Summary Judgment.

then paid itself and its affiliates more than 100% of their claims, leaving SEACOR with nothing. These facts warrant granting summary judgment in favor of SEACOR.

### E.    Bankruptcy proceedings and whether SEACOR is a critical vendor are irrelevant to GOL's contractual obligations.

GOL's attempt to invoke Cox's bankruptcy proceedings and bankruptcy "critical vendor" concepts is irrelevant and has no bearing on the central issue before this Court: whether GOL breached its contractual and fiduciary obligations to SEACOR under the Brokerage Agreement.

Contrary to GOL's argument, the bankruptcy court's jurisdiction does not apply to this dispute.  GOL argues that "a creditor such as SEACOR's filing of a Proof of Claim subjects it to the jurisdiction of the bankruptcy court for determination of its claim and any related counterclaims or defenses."[51]  This is correct as to SEACOR's claim against Cox, but obviously wrong with respect to SEACOR's claim against GOL.  SEACOR's proof of claim in the Cox bankruptcy relates only to its claims against Cox—the debtor—not to its entirely separate contractual claim against GOL.  As the record demonstrates, this lawsuit is based solely on the Brokerage Agreement between SEACOR and GOL, to which Cox is not a party.  SEACOR could not bring these claims against GOL in the bankruptcy proceedings because GOL is not the debtor and is therefore not subject to the bankruptcy court's exclusive jurisdiction for these claims.  *See In re Zale Corp.*, 62 F.3d 746, (5th Cir. 1995) ("[T]he bankruptcy court has no jurisdiction over a matter that does not affect the debtor.").

The cases cited by GOL are off point because GOL is not the debtor in Cox's bankruptcy proceeding.  In both *In re Efficient Sols., Inc.*, 2000 WL 1876356, at *6 (E.D. La. Dec. 20, 2000) (Vance, J.), and *In re OCA, Inc.*, 2007 WL 1728914, at *3 (E.D. La. June 13, 2007) (Vance, J.),

---

[51] Rec. Doc. 36-1, at 8, GOL's Motion for Summary Judgment.

PD.49964439.5

this Court found the exclusive jurisdiction of the bankruptcy court applied because the lawsuits involved claims directly against the debtor. Here, SEACOR's claims are strictly against GOL for breach of contract and fiduciary duty, making the bankruptcy court's jurisdiction over claims against Cox irrelevant.

GOL further argues that SEACOR's separate efforts to recover directly from Cox preclude its claims against GOL.[52] This, too, is incorrect. The Brokerage Agreement contains no provision indicating that pursuing claims against the charterer (Cox) waives or extinguishes SEACOR's independent right to recover from GOL for funds that GOL actually collected using SEACOR's invoices. SEACOR's pursuit of its rights against Cox is independent of its right to hold GOL accountable for breach of contract and breach of fiduciary duty. There is no exclusivity or election-of-remedies clause in the Brokerage Agreement that would bar SEACOR's claims here.

Finally, GOL's "critical vendor" argument is a red herring. GOL contends that its status as a critical vendor in the Cox bankruptcy, and the fact that SEACOR was not a critical vendor, precluded GOL from tendering any of the Trade Agreement Payment Amount to SEACOR.[53] But GOL offers no support for this assertion. The critical fact is that GOL included SEACOR's invoices in the Prepetition Claim and received $13 million in settlement of that claim—funds that were, in part, attributable to SEACOR's invoices. Under the Brokerage Agreement, GOL was obligated to remit to SEACOR the portion of those funds corresponding to SEACOR's invoices. GOL's separate agreement with Cox to serve as a critical vendor does not alter, diminish, or excuse its contractual and fiduciary duties to SEACOR.

---

[52] Rec. Doc. 36-1, at 9, GOL's Motion for Summary Judgment.

[53] Rec. Doc. 36-1, at 10, GOL's Motion for Summary Judgment.

To be clear, the critical vendor doctrine is relevant only to whether *GOL* could receive payment from the bankruptcy estate—it has no bearing on what GOL is permitted or required to do with those funds once received from the estate. The critical vendor doctrine is a bankruptcy court tool that allows a debtor to pay certain prepetition claims of "critical" suppliers to facilitate reorganization, but it does not impose any restrictions on how the recipient of those funds may or must use them, nor does it override the recipient's contractual obligations to third parties. Once a critical vendor receives payment, those funds are not subject to special restrictions under bankruptcy law and may be used or disbursed according to the vendor's own obligations and agreements.

Here, the Brokerage Agreement—not the separate critical vendor arrangement—controls GOL's obligations. That agreement explicitly requires GOL to apply payments to SEACOR's prepetition invoices and to remit to SEACOR all funds collected on its behalf. This is the relevant issue, not GOL's invocation of an inapplicable bankruptcy concept. As courts have observed in similar situations, "the parties' rights under the terms of their prepetition agreement have not been altered or extinguished by operation of nonbankruptcy law, both parties remain subject to the contractual obligations, and rejection of the contract constitutes a breach." *In re Penn Traffic Co.*, 524 F.3d 373, 383 (2d Cir. 1985). GOL's liability to SEACOR for money recovered under the Brokerage Agreement was not altered by the bankruptcy proceedings. *See Grossich v. Collet*, 1990 WL 51701, at *2 (N.D. Ill. Apr. 17, 1990) ("Defendant argues that the subsequent confirmation of CVI's reorganization plan somehow affects defendant's liability under the guaranty. This argument contradicts the Bankruptcy Code itself."); 11 U.S.C. § 524(e) ("[D]ischarge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."); *Mellon Bank v. Siegel*, 96 B.R. 505, 506 (E.D. Pa.

1989) ("While the Bankruptcy Code expressly alters the contractual obligations of the bankrupt, it does not contemplate that same effect on the obligations and liabilities of third parties to a creditor").

GOL's reliance on *In re Meridian Automotive Systems-Composites Operations, Inc.*, 372 B.R. 710 (Bankr. D. Del. 2007), is completely misplaced.[54] Not only is *Meridian* not binding on this Court, but it is also wholly unpersuasive and factually distinguishable. *Meridian* involved a dispute between a supplier and a debtor over performance under a trade agreement and critical vendor arrangement. *Id.* at 714. It did not address, let alone restrict, the rights of a non-party principal (SEACOR) to recover from its agent (GOL) funds collected to an entirely separate contract. And *Meridian* is silent on the question of whether there are any restrictions on what a critical vendor can do with the payments once received. That silence is no coincidence. GOL has cited no case that imposed restrictions on how a critical vendor (like GOL) could use funds that it received from an estate. As far as SEACOR can ascertain, no such restriction exists.

Finaly, and most critically, *Meridian* says nothing to suggest that a party's status as a critical vendor permits it to avoid its contractual obligations to non-debtor parties. The case does not support the proposition that GOL can retain funds collected using SEACOR's invoices without remitting SEACOR's share. Most obviously, it does not authorize GOL to "loan" significant funds that were rightly due SEACOR to GOL's affiliated companies.

The Brokerage Agreement and the Trade Agreement, not vague inapplicable concepts of critical vendor theory, control. The Brokerage Agreement explicitly requires GOL to make all reasonable efforts to collect and to remit to SEACOR all funds collected on SEACOR's invoices. The Trade Agreement requires GOL to apply the $13 million payment to the Prepetition Claim

---

[54] Rec. Doc. 36-1, at 11, GOL's Motion for Summary Judgment.

(which included SEACOR's invoices).  As the record shows, GOL collected funds based on SEACOR's invoices, paid itself and affiliates more than 100% of their claims, remarkably paid some sums to entities that <u>had no claims against Cox</u> and paid SEACOR nothing.  This is a straightforward breach of contract and fiduciary duty, which warrants summary judgment in favor of SEACOR.

### F.    GOL still has not provided an accurate accounting of Cox's payments.

Multiple factual questions remain regarding GOL's duty to provide a proper accounting of the funds it received from Cox.  As evidence that it has satisfied its duty to provide an accounting to SEACOR, GOL points only to its response to SEACOR's Interrogatory No. 3: a spreadsheet listing Cox's payments to GOL from September 1, 2022, to April 15, 2025.[55]  But this purported accounting raises more questions than it answers.  The spreadsheet merely lists the amounts collected by GOL from Cox; it provides no information about how GOL distributed those funds or whether GOL actually remitted any portion to SEACOR or other vendors for the use of their vessels.

Contrary to GOL's assertion that it has satisfied any accounting duty, SEACOR has submitted evidence demonstrating that $1.6 million of the $13 million Trade Agreement payment is unaccounted for and cannot be traced to any recipient based on the records produced.[56]  GOL cannot refuse to account for $1.6 million of the funds that it received and simultaneously argue that it has provided a full and complete accounting.

---

[55] Rec. Doc. 36-2, at 125, Spreadsheet attached to GOL's Answers to Interrogatories.

[56] Exhibit 3, Expert Report of Holly Sharp, pp. 15, 24.

III.    **Conclusion**

GOL's motion for summary judgment should be denied because substantial evidence demonstrates that GOL breached its contractual and fiduciary obligations to SEACOR by failing to remit the funds it collected based on SEACOR's invoices.  The Court should instead grant summary judgment in favor of SEACOR under Rule 56(f).  GOL's attempts to invoke the Cox bankruptcy proceedings, its status as a critical vendor, and other distractions do not excuse its clear duty under the Brokerage Agreement to account for and pay SEACOR its share of the amounts collected on SEACOR's invoices.  At bottom, it is undisputed that GOL collected money owed to SEACOR and then distributed that money to GOL's affiliates instead of to SEACOR.  That is a clear and plain breach of GOL's obligations and warrants judgement in SEACOR's favor in the amount of $2,455,250.64.

Respectfully submitted,

**PHELPS DUNBAR LLP**

BY:    */s/ Arthur R. Kraatz*
        Gary A. Hemphill (Bar #6768)
        Arthur R. Kraatz (Bar #35194)
        Canal Place | 365 Canal Street, Suite 2000
        New Orleans, Louisiana 70130
        Telephone: 504 566 1311
        Facsimile: 504 568 9130
        Email: gary.hemphill@phelps.com
        Email: arthur.kraatz@phelps.com

**ATTORNEYS FOR PLAINTIFF SEACOR MARINE LLC**

PD.49964439.5