UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

SEACOR MARINE, LLC                                   CIVIL ACTION

VERSUS                                                        NO. 24-2409

GOL, LLC                                                SECTION "R" (3)

## ORDER AND REASONS

Before the Court is defendant GOL, LLC's ("GOL") motion for summary judgment.[1]  Plaintiff SEACOR Marine ("SEACOR") opposes defendant's motion and moves the Court to grant summary judgment in its favor under Federal Rule of Civil Procedure 56(f).[2]  The Court grants GOL's motion and dismisses SEACOR's complaint with prejudice.

## I.    BACKGROUND

The Court has reviewed the record and determines the undisputed facts are as follows.  On May 17, 2018, GOL and SEACOR entered into a Brokerage Agreement.[3]  The Brokerage Agreements says that GOL and SEACOR "separately are in the business of providing crewed vessels for

---

[1]     R. Doc. 36.
[2]     R. Doc. 46.
[3]     R. Doc. 36-3 at ¶ 1; R. Doc. 46-1 at ¶ 1; R. Doc. 36-2, Exhibit A.

marine transportation in support of oil and gas exploration and production."[4] It further states that "from time to time in situations of excess demand for vessels or otherwise, [GOL] acts as a vessel broker between various charterers of vessels and the operators of such vessels" like SEACOR.[5] The Agreement states that SEACOR "wishes to establish a relationship by which [GOL] can serve as a boat broker for [SEACOR's] vessels."[6] Accordingly, under the Brokerage Agreement, SEACOR appointed GOL as its agent "solely for the purpose of obtaining charters for [SEACOR's] vessels."[7] It further provides that the Agreement was not an exclusive appointment, and that GOL "will act for [SEACOR] on a job-by-job basis and not as the exclusive broker."[8] It states that when GOL obtains a proposed charter for a vessel, it was required to "provide . . . all necessary information it receives from the prospective [c]harterer" to SEACOR, which had the "right to accept or reject the charter so offered."[9] Under the Agreement, SEACOR authorized GOL to sign, as the agent, a charter agreement, but only with consent from SEACOR.[10]

---

[4]    R. Doc. 36-2, Exhibit A at 1.
[5]    *Id.*
[6]    *Id.*
[7]    *Id.*
[8]    *Id.*
[9]    *Id.*
[10]   *Id.*

The Brokerage Agreement outlines the responsibilities regarding payments for charters obtained by GOL as follows:

A. For charters in which Charterer pays charter hire to [GOL], [SEACOR] consents to the Charterer paying the charter hire to [GOL] [sic].  Invoicing by [GOL] to the Charterer will be on a per-job basis and according to the requirements of the Charterer.

B. [GOL] will use reasonable efforts to obtain from the Charterer provisions for payment within a reasonable time.

C. [GOL] will remit net charter hire (charter hire less [GOL's] fee) to [SEACOR] within fifteen (15) business days after receipt of such charter hire from the Charterer. . . . In the event charter hire is paid directly to [SEACOR] from the Charterer, [SEACOR] shall remit broker's fee to [GOL] within the same fifteen (15) day period.

D. Under no circumstances shall [GOL] be responsible to [SEACOR] for the Charterer's non-payment of charter hire.  [GOL] agrees to undertake all reasonable efforts to collect charter hire from the Charterer.  [SEACOR] retains the right to act on its own behalf in order to collect unpaid invoices directly from the Charterer.[11]

Sometime after entering into this agreement, GOL arranged for the charter of SEACOR's vessels to Cox Operating, LLC ("Cox").[12]

This case arises out of invoices issued to Cox for charter hire of SEACOR's vessels between September 2022 and December 2022.  During that period, SEACOR provided vessels to Cox, and GOL issued invoices for the charters.[13]  On May 14, 2023, Cox filed for bankruptcy relief under

---

[11]    *Id.* at 2-3.

[12]    R. Doc. 36-3 at ¶ 2; R. Doc. 46-1 at ¶ 2; R. Doc. 1 at 2.

[13]    R. Doc. 36-3 at ¶ 3; R. Doc. 46-1 at ¶ 3; R. Doc. 36-2, Exhibit B.

Chapter 11,[14] at which time Cox was delinquent on certain outstanding invoices for charter of SEACOR's vessels.[15]

GOL filed, and later preserved, liens against various of Cox's oil and gas producing properties to secure payment of outstanding invoices, including invoices from SEACOR.[16]  Additionally, SEACOR filed its own liens against Cox's oil and gas producing properties.[17]  As of May 25, 2023, GOL estimated that its prepetition claim in the Cox bankruptcy amounted to $24.8 million.[18]  This amount included approximately $2.7 million in unpaid invoices for SEACOR's services.[19]  On July 24, 2023, GOL filed a proof of claim for approximately $15.9 million,[20] which GOL states that it continues

---

[14]   R. Doc. 36-3 at ¶ 15; R. Doc. 46-1 at ¶ 15.

[15]   R. Doc. 1 at 2.  The parties dispute whether the invoices have since been paid.  *See* R. Docs. 46, 48.

[16]   R. Doc. 36-3 at ¶¶ 6-7; R. Doc. 46-1 at ¶¶ 6-7; R. Doc. 36-2, Exhibit C; R. Doc. 36-2, Exhibit D.

[17]   R. Doc. 36-3 at ¶ 8; R. Doc. 46-1 at ¶ 8; R. Doc. 36-2, Exhibit D.

[18]   R. Doc. 46-3, Exhibit 2 at 1.

[19]   R. Doc. 46-2, Exhibit 1 at 13; R. Doc. 36-2, Exhibit B.

[20]   Bankr. S.D. Tex. Case No. 23-90324, Claims Register R. Docs. 27-1, 27-2.  The Court takes judicial notice of the existence of the proof of claim and amended proof of claim but makes no determinations as to the accuracy of the contents within.  Under Federal Rule of Evidence 201, the Court can judicially notice facts that are "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201.  "The Bankruptcy Code provides that all papers filed in a bankruptcy case and the dockets of a bankruptcy court are public records except for limited . . . exceptions."  The exceptions outlined in the bankruptcy code are not applicable here.

to pursue for the benefit of SEACOR.  SEACOR admits that it filed its own proof of claim in the bankruptcy proceedings, which, as of July 2025, remain pending.[21]

After filing its Chapter 11 petition, Cox filed a motion seeking authorization to pay certain undisputed, liquidated prepetition amounts to creditors who agreed to provide essential services during the bankruptcy proceedings.[22]  The motion is explicit in its aims.[23]  The motion represents that Debtors identified "a select subset of vendor activities essential to the continued, safe, and responsible daily operation of the Debtor's Oil and Gas Leases," referred to as "Essential Vendor Activities."[24]  The Essential Vendor Activities included: (1) transportation and dock services; (2) third-party labor providers; (3) specialized materials, equipment, and supplies; (4) offshore compression and generation providers; and (5) regulatory and

---

*See* 11 U.S.C. § 107.  Therefore, the proof of claim is a matter of public record that this Court may, and does, take judicial notice of.  *See PNC Bank, Nat'l Assoc. v. Ruiz*, 2023 WL 3340078, at *4 (5th Cir. May 10, 2023) (holding that a "district court did not err in taking judicial notice" of bankruptcy records as they "are matters of public record.").

[21]    R. Doc. 36-3 at ¶ 9; R. Doc. 46-1 at ¶ 9.

[22]    Bankr. S.D. Tex. Case No. 23-90324, R. Doc. 15.  The Court takes judicial notice of this record.  *See PNC Bank*, 2023 WL 3340078, at *4 (holding that a "district court did not err in taking judicial notice" of bankruptcy records as they "are matters of public record.").

[23]    Bankr. S.D. Tex. Case No. 23-90324, R. Doc. 15.

[24]    *Id*. at 4.

compliance related vendors.[25]  It represented that "any interruption of the Essential Vendor Activities would significantly diminish" its ability to reorganize which would "diminish recoveries for all stakeholders."[26]  The motion thus seeks authorization to "pay at least a portion of the prepetition amount due with respect to the Essential Vendor Activities," as not doing so "would likely result in the cessation of Essential Vendor Activities."[27]  The motion additionally states that "the Debtors intend to pay Essential Vendor Obligations . . . only to the extent necessary to preserve their businesses and only to the extent that Vendors receiving such payments agree to continue providing goods and services . . . [under] Customary Trade Terms."[28]  Customary Trade Terms are defined as "trade terms that are the same or better than the trade terms that existed immediately prior to the Petition Date or, if more favorable, that existed within the one hundred eighty (180) day period prior to the Petition Date."[29]  The Motion specifically sought to pay $40 million towards essential operating expenses.[30]

---

[25]    *Id.* at 5-7.
[26]    *Id.* at 4.
[27]    *Id.* at 5.
[28]    *Id.* at 9-10.
[29]    *Id.*
[30]    *Id.* at 3.

In May 2023, the bankruptcy court entered an order authorizing such

payments.[31]  The Order states:

> The Debtors are authorized, but not directed, to pay accrued and
> outstanding prepetition Oil and Gas Obligations in the ordinary course
> of business in the amounts, categories, and manners described in the
> Motion.[32]

It continues:

> The Debtors are authorized to require that, as a condition to receiving
> any payment of a prepetition claim under this Order, a payee maintain
> or apply, as applicable, terms during the pendency of the Chapter 11
> Cases that are the same or better than the trade terms that existed
> immediately prior to the Petition Date or, if more favorable, that
> existed within the one hundred eighty (180)-day period prior to the
> Petition Date, or that are otherwise satisfactory to the Debtors
> ("Customary Trade Terms").  If a payee, after receiving a payment of a
> prepetition claim under this Order, ceases to provide Customary Trade
> Terms, then the Debtors may, in their sole discretion, deem such
> payment to apply instead to any postpetition amount that may be
> owing to such payee or treat such payment as an avoidable postpetition
> transfer of property.[33]

Thereafter, Cox and GOL entered into a Trade Agreement, under which

GOL agreed to continue providing services to Cox on Customary Trade

Terms and Cox provided GOL $13 million to be applied towards GOL's

---

[31]    R. Doc. 36-2, Exhibit F; Bankr. S.D. Tex. Case No. 23-90324, R. Doc.
        112.
[32]    R. Doc. 36-2, Exhibit F at 2.
[33]    R. Doc. 36-2, Exhibit F at 2.

prepetition claim.[34]  The Trade Agreement requires GOL "to agree to supply goods and/or services to [Cox] based on 'Customary Trade Terms'" in order to "receive payment on pre-bankruptcy claims."[35]  It additionally states that GOL "has regularly provided, and may continue to provide, the services of vessels owned and operated by third-party vessel owners and operators" and defined those vessel owners and operators who agree to continue to provide essential services based on Customary Trade Terms as "Third-Party Vessel Interests."[36]  The Agreement states that the "inability of Third-Party Vessel Interests to provide services to GOL or [Cox] shall not be a default by GOL," but that to avoid default, GOL must "supply the same or commercially equivalent fleet of vessels" that the Third-Party Vessel Interest was to provide.[37]  There is no dispute as to the Agreement's requirement that GOL serve as an essential vendor, but the parties dispute the Agreement's applicability and meaning vis-à-vis SEACOR.

---

[34]    R. Doc. 46-3.  The parties agree on the sum received pursuant to the Trade Agreement but dispute whether it can be construed as payment towards SEACOR's outstanding invoices.

[35]    R. Doc. 46-3 at 1.

[36]    *Id.*

[37]    *Id.*

GOL continued to provide Cox vessel services and later filed in the bankruptcy proceeding an application for allowance of an administrative expense claim for $6.2 million for post-petition materials and services.[38]

On February 28, 2024, the Bankruptcy Court converted Cox's Chapter 11 proceedings to Chapter 7 proceedings[39] and appointed a Chapter 7 Trustee.[40] The Chapter 7 Trustee has since filed a case in the Eastern District of Louisiana, in which the Trustee alleged that Cox was victim of "gross mismanagement and pillaging by insiders."[41]

---

[38]    Bankr. S.D. Tex. Case No. 23-90324, R. Doc. 2066.  The Court takes judicial notice of the existence of the filing but makes no determinations as to the accuracy of the contents within.  *PNC Bank*, 2023 WL 3340078, at *4 (holding that a "district court did not err in taking judicial notice" of bankruptcy records as they "are matters of public record."); *In re SI Restructuring Inc.*, 480 F. App'x 327, 329 (5th Cir. 2012) ("[W]hile 'a court may take judicial notice of a document filed in another court . . . to establish the fact of such litigation and related filings, a court cannot take judicial notice of the factual findings of another court.'" (quoting *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 830 (5th Cir. 1998))).

[39]    Bankr. S.D. Tex. Case No. 23-90324, R. Doc. 1720.  The Court takes judicial notice of this record.  *See PNC Bank*, 2023 WL 3340078, at *4.

[40]    Bankr. S.D. Tex. Case No. 23-90324.  The Court takes judicial notice of this record.  *See PNC Bank*, 2023 WL 3340078, at *4.

[41]    E.D. La. Case No. 25-943, R. Doc. 1.  Documents filed in a court proceeding are public records.  *See Harris v. Cty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) ("[M]atters of public record . . . includ[e] documents on file in federal or state court."); *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) ("[D]ocket sheets are public records. . . ."). While the Court does not take judicial notice of the conclusions within the complaint, the Court takes judicial notice of the complaint itself and the allegations within.  *In re SI Restructuring*

On October 4, 2024, SEACOR filed its complaint against GOL in this Court.[42]  SEACOR alleges that GOL breached its contractual and other duties owed to SEACOR.[43]  SEACOR claims that GOL breached its contractual duty to use "all reasonable efforts" to collect charter hire, failed to pay SEACOR funds due to it based "on information and belief" that GOL was paid by Cox, and failed to provide an accounting.  SEACOR seeks a "full accounting" of GOL's dealings with Cox as they relate to SEACOR and demands that GOL pay SEACOR the full amount of the outstanding invoices (approximately $2.7 million), as well as any other relief the Court finds appropriate.[44]

GOL now moves for summary judgment.[45]  GOL argues that there has been no breach of the contract between GOL and SEACOR and that SEACOR lacks any rights to receive funds paid to GOL under the Trade Agreement between Cox and GOL.[46]  SEACOR opposes the motion, asserting that GOL breached its contractual and fiduciary duties by failing to take appropriate steps to obtain payment from Cox and by failing to remit monies to SEACOR

---

*Inc.*, 480 F. App'x at 329 ("[W]hile 'a court may take judicial notice of a document filed in another court . . . to establish the fact of such litigation and related filings, a court cannot take judicial notice of the factual findings of another court.'" (quoting *Taylor*, 162 F.3d at 830)).

[42]  R. Doc. 1.

[43]  *Id.* at 3-4.

[44]  *Id.*

[45]  R. Doc. 36.

[46]  *Id.*

after GOL received payment from Cox in the bankruptcy proceeding. SEACOR also alleges that GOL still has not provided a full accounting, which SEACOR claims it is owed.[47]  SEACOR additionally moves the Court to grant summary judgment *sua sponte* in its favor under Rule 56(f).[48]  The Court considers the parties' arguments below.

## II.   LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).  "When assessing whether a dispute to any material fact exists, [the Court] consider[s] all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins.*, 530 F.3d 395, 398-99 (5th Cir. 2008) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  All reasonable

---

[47]   R. Doc. 46.
[48]   *Id.*

inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2738 (2d ed. 1983)); *see also Little*, 37 F.3d at 1075 (noting that the moving party's "burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence" (citations omitted)). "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for

resolution. *See, e.g.*, *id.*; *Little*, 37 F.3d at 1075 ("Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322)).

Additionally, under Federal Rule of Civil Procedure 56(f), a court may "grant summary judgment for a nonmovant" after giving the nonmovant "notice and a reasonable time to respond." Summary judgment to a nonmovant is available when the party against whom summary judgment is granted is aware the legal issue is "at play and had a full opportunity to argue against it and present whatever evidence he had." *Atkins v. Salazar*, 677 F.3d 667, 681 (5th Cir. 2016).

The Court notes that this matter is set for bench trial. "[E]ven at the summary judgment stage, a judge in a bench trial has the limited discretion to decide that the same evidence, presented to him or her as trier of fact in a plenary trial, could not possibly lead to a different result." *Matter of Placid Oil Co.*, 932 F.2d 394, 398 (5th Cir. 1991). This is because "it makes little sense to forbid the judge from drawing inferences from the evidence submitted on summary judgment when that same judge will act as the trier of fact." *Id.*

## III.  DISCUSSION

### A. Obligations Under the Brokerage Agreement

In maritime cases, a plaintiff alleging breach of contract must demonstrate the following elements: "'(1) contract; (2) breach of that contract; and (3) damages.'" *Mid-Gulf Shipping Co. Inc. v. Energy Subsea LLC*, 472 F. Supp. 3d 318, 324 (E.D. La. 2020) (Africk, J.) (quoting *FEC Heliports, LLC v. Hornbeck Offshore Operators, LLC*, No. 15-4827, 2016 WL 5678557, at *5 (E.D. La. Oct. 3, 2016) (Feldman, J.)).

A contract "'governed by federal maritime [law] should be read as a whole and its words given their plain meaning unless the provision is ambiguous.'" *LLOG Exploration Co. v. Signet Maritime Corp.*, 673 F. App'x 422, 425 (5th Cir. 2016) (quoting *Weathersby v. Conoco Oil Co.*, 752 F.2d 953, 955 (5th Cir. 1984)).  "'Disagreement as to the meaning of a contract does not make it ambiguous, nor does uncertainty or lack of clarity in the language chosen by the parties.'" *Breaux v. Halliburton Energy Servs.*, 562 F.3d 358, 364 (5th Cir. 2009) (quoting *Weir v. Fed. Asset Disposition Ass'n*, 123 F.3d 281, 286 (5th Cir. 1997)).  "Where 'the written instrument is so worded that it can be given a certain definite legal meaning or interpretation, then it is not ambiguous, and [the court] will construe the contract as a matter of law.'" *Breaux*, 562 F.3d at 364 (quoting *Weir*, 123 F.3d at 286).

### 1. Payment of charter invoices

The Court finds that the Brokerage Agreement is unambiguous. The Brokerage Agreement expressly states that "[b]roker [GOL] will remit net charter hire . . . to Operator [SEACOR] within fifteen (15) business days after receipt of such charter hire from the Charterer."[49] The next clause of the Agreement provides that "under no circumstances" will GOL be responsible for a Charterer's "non-payment of charter hire."[50] It is undisputed that the Brokerage Agreement has a pay-if-paid clause,[51] which is a suspensive condition. *Cf. Material Handling Tech., Inc. v. Southland Process Grp. LLC*, 2020 WL 1042236 at *4 (citing *Tymless Flooring, Inc. v. Rotolo Consultants, Inc.*, 172 So. 3d 145, 146 (La. App. 4 Cir. 5/20/15)). If GOL has not been paid, then its obligation to pay SEACOR has not been triggered. *See id.* at *6. Whether, therefore, GOL owes SEACOR payments for the Cox charter hires depends on whether GOL has received payment on SEACOR's invoices.

SEACOR claims that GOL has been paid because GOL collected approximately $13 million as part of the Trade Agreement it entered with Cox in Cox's Chapter 11 bankruptcy. GOL contends that it was not paid on SEACOR's invoices. It argues that the payment was for agreeing to provide

---

[49]    R. Doc. 36-2 at 2.

[50]    *Id.*

[51]    R. Doc. 46-1 at ¶ 5.

post-petition essential services, and that SEACOR is not entitled to payment because it is not an essential vendor under the Trade Agreement and Bankruptcy Order.

The Trade Agreement does not list specific invoices to which the $13 million corresponds; it states simply that Cox's $13 million payment is "towards GOL's [p]repetition [c]laim."[52]  The record lacks any evidence that funds received from Cox were to be allocated to SEACOR's invoices.  And there is no evidence that the $13 million was to apply pro rata to all invoices comprising the estimated $24.8 million prepetition claim.  Accordingly, the Court finds that GOL has not been "paid" SEACOR's invoices.  As the Brokerage Agreement obliges GOL to remit funds only once paid, GOL has not breached its contractual duty to pay SEACOR.

Further, SEACOR is not entitled to any portion of the $13 million because it does not meet the requirements outlined by the Trade Agreement and the Bankruptcy Order, which authorized payments of prepetition obligations "in the amounts, categories, and manners described in [Debtor's] motion."[53]  To avoid this conclusion, SEACOR largely avoids the context of the Trade Agreement.  SEACOR instead points to the Trade Agreement's

---

[52]    R. Doc. 46-3, Exhibit 2 at 1.
[53]    R. Doc. 36-2, Exhibit F at 2.

general hierarchy for disbursement, which lists "amount[s] secured by a lien" as receiving second priority.[54]   While the Agreement does contain this hierarchy, and SEACOR's invoices do fall into this second category, the hierarchy must be understood in the context of the whole Agreement and its purposes.   The Court looks to the complete Trade Agreement and the Bankruptcy Order, which is expressly referred to in the Trade Agreement and a copy of which was enclosed with the Trade Agreement, to determine whether SEACOR's invoices were to be paid from the $13 million under the Trade Agreement.  *Cf. Bloom v. Hearst Entm't, Inc.*, 33 F.3d 518, 522 (5th Cir. 1994) (A term is not ambiguous unless "it is susceptible to more than one meaning when viewed objectively by a reasonably intelligent person who has examined the *context of the entire integrated agreement* and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business." (emphasis added) (quoting *Walk-In Medical Centers, Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2nd Cir. 1987))).

The Trade Agreement states that Cox has received authorization from the Bankruptcy Court to, under certain conditions, pay prepetition claims for essential vendors that agreed to be bound by the terms of the Bankruptcy

---

[54]    *Id.* at 2.

Order and the terms of the Trade Agreement.[55]  The Bankruptcy Order that provided this authorization enabled Cox "to pay accrued and outstanding prepetition . . . [o]bligations" to parties that agree to continue to provide to Cox "Customary Trade Terms."[56]  The Trade Agreement states the same requirement.  Additionally, the Trade Agreement, recognizing GOL's status as a vessel broker, authorized GOL to engage vessel companies that had provided prepetition services to Cox and agreed to "*continue* providing vessels and/or services based on Customary Trade Terms" (emphasis added).  The Agreement labeled these entities "Third Party Vessel Interests." Thus, the Agreement contemplated that GOL would continue to act as a vessel broker, and those Third Party Vessel Interests would participate under the Agreement and its conditions.

Moreover, the Trade Agreement, Bankruptcy Order, and underlying Motion all make clear that the aim of paying prepetition claims pre-confirmation was to help Cox successfully reorganize.  This goal would be achievable only if the money that Cox was authorized to disburse was to entities that continued to provide, under Customary Trade Terms, the essential goods and services explicitly mentioned in the Bankruptcy Motion

---

[55]    R. Doc. 46-3, Exhibit 2 at 1.
[56]    R. Doc. 32-2, Exhibit F at 2.

which was adopted in the Bankruptcy Order.  Indeed, such constrained distributions were all that the Bankruptcy Motion contemplated and the Bankruptcy Order subsequently authorized.  And this is all that is allowed under bankruptcy code, which ordinarily does not allow for the pre-confirmation payment of pre-petition debts.  *In re Roman Catholic Church of Archdiocese of New Orleans*, 2022 WL 4005570 at *6 (Bankr. E.D. La. Aug. 31, 2022) ("A chapter 11 debtor generally may not make any payments or other distributions on account of prepetition claims except through a confirmation plan of reorganization or court authorized liquidation." (quoting *In re Pioneer Health Servs.*, 570 B.R. 228, 232 (Bankr. S.D. Miss. 2017) (internal quotations omitted))); *In re Sticky's Holdings LLC*, No. 24-10856 (JKS), 2025 WL 1571906, at *10 n. 93 (Bankr. D. Del. June 3, 2025) ("Generally, absent court order, a chapter 11 debtor cannot make payments on account of prepetition claims except through a plan." (citing 11 U.S.C. § 1129(b)(1))).  Thus, vendors/suppliers had to agree to continue providing Cox with essential services under Customary Trade Terms to receive any payment towards their prepetition claims.

SEACOR argues that those agreements bind GOL's future obligations to Cox but do not prohibit GOL from paying invoices to parties like SEACOR, which are not continuing to provide Cox with services under "Customary

Trade Terms." GOL argues that the agreements do not contemplate any payments to entities that do not serve as essential vendors. Further, GOL argues, and SEACOR does not contest, that SEACOR is not serving as an essential vendor.

The evidence in the record shows that SEACOR had stopped providing services to Cox months before Cox filed for bankruptcy.[57] Indeed, Jesus Llorca, SEACOR's Executive Vice President and CFO, admitted that by the end of 2022 SEACOR was wary of continuing to provide Cox services as Cox was slow to pay, had already accumulated a large receivable, and there were rumors of Cox's precarious financial position.[58] The 30(b)(6) deposition of Mr. Llorca confirms this. The deposition transcript reads:

> Q. Okay.
> A. So we were, I think, all of us, collectively, very wary as to how much additional credit we were willing to extend to Cox.
> Q. Okay.
> A. Right. Now, I mean, again, we had no visibility and nothing had been filed. But the rumors of Cox, like being in — in not the best financial position were — were on the street, right.
> Q. Okay. And so that was something that SEACOR would've been aware of in — by the end of 2022?
> A. I mean, generally speaking, they were — they were not the best payers, right. So by the end of 2022, we would have become increasingly concerned.
> Q. All right. And is that why SEACOR pulled its vessels and stopped providing vessels in December of 2022?

---

[57] R. Doc. 48-1, Exhibit A at 6-8.

[58] *See id.*

A.  I don't think it's fair to say that we pulled the vessels.  We just finished the jobs and did not provide additional vessels.

Q. Okay.

A.  Right.  Because why would you — you know, we decided not to extend additional credit on commercial terms to Cox in the regular practice, you know.

. . .

Q.  So the reason why, in the beginning of 2023 up until the time they filed for bankruptcy, y'all decided not to continue providing services is because you were not go[ing] [to] be able to continue to extend Cox credit?

A. We, we had — we had already accumulated a fairly large receivable for a customer of that size.  And with the payment history they had with us and the rumors that were on the street, so we were wary.

Q.  Right.  And so by January of 2023 y'all were not willing to continue to provide additional vessel services to Cox?

A.  On commercial terms.[59]

Further, SEACOR's proof of claim addendum states that SEACOR stopped working for Cox in December 2022 because of non-payment.[60]  The Court finds that the record demonstrates that SEACOR did not serve as an essential vendor.

SEACOR was therefore not entitled to money disbursed under the Bankruptcy Order and Trade Agreement, which allows only for limited payments on prepetition invoices to enable Cox's continued operation during the bankruptcy proceedings.  As SEACOR did not continue to provide

---

[59]    *Id.*

[60]    R. Doc. 36-2, Exhibit B at 10.

essential services to Cox post-petition, it was not entitled to receive pre-confirmation payment towards outstanding invoices.

Furthermore, to the extent that the Trade Agreement does not explicitly state that GOL can apply the $13 million *only* to prepetition claims held by entities who agreed to continue to provide essential services at customary rates, the Agreement's aims, and the context of the Bankruptcy Order and Chapter 11 confirm this understanding. SEACOR's proposed interpretation, under which GOL could pay the entire $13 million to prepetition claims of parties that did not agree to continue to provide essential services at prepetition rates, would defeat the purpose of the Agreement. The Agreement, the Bankruptcy Order, and the Motion it was based on, were all designed to give Cox the best opportunity to successfully reorganize, a key goal of Chapter 11.[61] *See e.g., In re Ionosphere Clubs, Inc.,* 98 B.R. 174, 176 (Bankr. S.D. N.Y. 1989) ("[T]he paramount policy and goal of Chapter 11, to which all other bankruptcy policies are subordinated, is the rehabilitation of the debtor."). To find that the Trade Agreement did not impose limitations in line with this aim would be illogical.

---

[61]    The Court looks to Chapter 11 to inform the Agreement as it essential to the context in which the Agreement was crafted. *Cf. Bloom*, 33 F.3d at 522.

This is true because the purpose of allowing prepetition payments is to induce parties to continue providing essential services to Cox during the bankruptcy proceedings and prior to confirmation of a plan of reorganization. *See e.g.*, 4 Norton Bankr. L. & Prac. 3d § 95:1 (July 2025) ("To successfully reorganize, in many cases, it will be necessary for the debtor to pay the prepetition claims of certain creditors, such as employees or suppliers prior to confirmation of a plan because of their importance to continued operations."). The debtor's motion applied to entities that were providing essential services at the time it filed its bankruptcy petition so that they would not discontinue those services.[62] It did not apply to entities like SEACOR that stopped providing services to Cox months before the bankruptcy petition was filed. Thus, the Trade Agreement authorized GOL to meet its obligations as an essential vendor by continuing to broker vessels owned and operated by Third-Party Vessel Interests, defined in the Trade Agreement as "third-party vessel owners and operators who agree to *continue* providing vessels and/or services based on Customary Trade Terms." (emphasis added). GOL likely could not entice parties to be Third-

---

[62]   Bankr. S.D. Tex. Case No. 23-90324, R. Doc. 15 at 5. ("[T]he Debtors believe that a failure to pay at least a portion of the prepetition amount due with respect to the Essential Vendor Activities . . . would likely result in the cessation of Essential Vendor Activities.")

Party Vessel Interests and continue dealing with a company in bankruptcy at terms the company did not honor before seeking bankruptcy relief, if GOL did not utilize the funds received to pay their prepetition invoices as an inducement to do so.  Thus, the payment that GOL received was disbursable only to entities that, like GOL, committed to continue to provide Cox with essential post-petition services under Customary Trade Terms.  SEACOR was not such a company.  GOL therefore did not have the discretion to use the money it received from Cox to pay SEACOR's invoices either in whole or in part.

Even if the Trade Agreement and Bankruptcy Order did not foreclose GOL from paying SEACOR part of the $13 million it received, SEACOR has not pointed to any evidence that GOL was *required* to pay SEACOR's invoices.  SEACOR argues that it would have been paid had GOL engaged in a first-in-first-out priority system for paying outstanding prepetition invoices.  However, SEACOR points to no evidence that this system was mandated.  SEACOR simply asserts that it is a "reasonable" system, under which SEACOR would have received payment for nearly all of its outstanding prepetition invoices.  That it may be a "reasonable" method does not mean it was required.  GOL's stated reason for not paying SEACOR, that SEACOR was not acting as a Third Party Vessel Interest/essential vendor, is

reasonable as well.  Indeed, for the reasons described in the preceding paragraphs, the most reasonable (if not the mandated) way for GOL to use the funds it received, was to pay prepetition claims to entities that agreed to continue providing essential services on Customary Trade Terms post-petition, not entities like SEACOR that had already stopped providing Cox services.  Thus, even if GOL were not foreclosed from paying SEACOR under the Trade Agreement, SEACOR has failed to show that GOL was required to pay SEACOR or that it was unreasonable in failing to do so.

For all the foregoing reasons, GOL has not breached its contractual duty to remit SEACOR invoices within 15 days of receipt.  The Court therefore must grant GOL's motion for summary judgment and deny summary judgment for SEACOR on this claim.

### 2. Accusations of "self-dealing" in fund distribution

SEACOR argues that GOL engaged in "self-dealing" by distributing funds primarily to companies wholly owned by GOL's owners.  But any improper allocation of funds under the Trade Agreement is something the debtor, and now the Chapter 7 trustee, can complain about, not SEACOR, who is not a party to the Agreement or entitled to funds under it.  The available redress would be for the payment to be deemed as applying to post-

petition services that GOL has since provided Cox or treated as a voidable preference.[63]  The money would not be reallocated to SEACOR.

To the extent that SEACOR argues that GOL's actions violate fiduciary duties owed under agency law, this too fails.

"Agency is a legal relationship created by an express or implied agreement or by operation of law whereby the agent is authorized to act for the principal, subject to the principal's control."  *Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273, 1296 (5th Cir. 1994).  Agency is never presumed and must be proven affirmatively.  *Id.*  The party who asserts the existence of an agency relationship must show that: (1) the principal indicated the agent was acting for it, (2) the agent acted or agreed to act on the principal's behalf, and (3) the agent was subject to the principal's control.  *Aetna Ins. Co. v. Glens Falls Ins. Co.*, 453 F.2d 687, 690-91 (5th Cir. 1972).  Further, "maritime law embraces the principles of agency."  *West India Indus., Inc. v. Vance & Sons AMC-Jeep*, 671 F.2d 1384, 1387 (5th Cir. 1982) (citing *Kirno Hill Corp. v. Holt*, 618 F.2d 982, 985 (2d Cir. 1980)).

SEACOR argues that GOL served as SEACOR's agent for the purpose of obtaining vessel charters.  SEACOR points to the Brokerage Agreement for support.  That agreement states: "Operator [SEACOR] hereby appoints

---

[63]    *See* R. Doc. 46-2, Exhibit 2 at 3.  *Cf.* R. Doc. 36-2, Exhibit F.

Broker [GOL] as Operator's agent solely for the purpose of obtaining charters for Operator's vessels."[64]  The agreement continues:

> At such time as Broker obtains a proposed charter for a vessel, Broker shall provide to Operator all necessary information it receives from the prospective Charterer, and Operator shall have the right to accept or reject the charter so offered . . . .
> If Operator orally agrees to accept a job offered by Broker, Broker is hereby authorized by Operator to sign, as agent on behalf of Operator, a Charter . . . . In no event is Broker authorized to sign on behalf of Operator, a Charter . . . without prior written communication with Operator. . . .[65]

This language establishes that GOL was SEACOR's agent in its capacity as procurer of charter hires for SEACOR's vessels.  This agency relationship was limited and non-exclusive.  The Brokerage Agreement stated that GOL was not SEACOR's exclusive broker, did not provide that GOL could not act as a broker for other vessel owners, and stated that GOL was also in the business of providing vessels.

The Fifth Circuit looks to the Restatement of Agency for guidance on general agency law.  *Port Ship Serv., Inc. v. Int'l Ship Mgmt. & Agencies Serv., Inc.*, 800 F.2d 1418, 1420 (5th Cir. 1986) (citing *Lubbock Feed Lots, Inc. v. Iowa Beef Processors*, 630 F.2d 250, 275-76 (5th Cir. 1980)); *see also Huntsman, LLC v. Blessey Marine Service, Inc.*, 2016 WL 1031330, at *4

---

[64]    R. Doc. 36-2, Exhibit A at 1.
[65]    *Id.*

(E.D. La. Mar. 15, 2016) (Barbier, J.) (applying the Restatement (Third) of Agency to a maritime case); *Constance Joy II, LLC v. Stewart & Stevenson FDDA LLC*, 2024 WL 4008094, at *5 (S.D. Tex. Aug. 30, 2024) (Tipton, J.) (same).  The Restatement (Third) of Agency states that fiduciary obligation "is not monolithic in its operation.  In particular, an agent's fiduciary duties to the principal vary depending on the parties' agreement and the scope of the parties' relationship."  § 8.01 (2006).

GOL was SEACOR's agent only for the limited purpose of obtaining charter hire and was obliged only to remit payments actually received.  GOL's fiduciary duties are thus similarly limited.  *See* Restatement (Third) of Agency § 8.01 (2006).  For the reasons stated above, GOL has not received payments on SEACOR's invoices, nor received payments that should have been disbursed to SEACOR under the Trade Agreement.

While GOL may have favored its sister companies in its use of the partial payment it did receive, SEACOR cannot challenge GOL's actions under a theory that it had a fiduciary duty to SEACOR over money to which SEACOR was not entitled.  To allow such a claim would require expanding the fiduciary obligation beyond the agreement and scope of the parties' relationship.

The Court therefore must grant GOL's motion for summary judgment and deny summary judgment for SEACOR on this claim.

### 3. Efforts to collect charter invoices

The Brokerage Agreement states that "[b]roker [GOL] will use reasonable efforts to obtain from the Charterer provisions for payment within a reasonable time" and that "[b]roker [GOL] agrees to undertake all reasonable efforts to collect charter hire from the Charterer."[66]  It additionally states that "[u]nder no circumstances shall [GOL] be responsible to [Cox] for the Charterer's non-payment of charter hire,"[67] a provision SEACOR ignores.  The Agreement itself does not provide guidance on what efforts would be deemed "all reasonable" ones.  When the word reasonable modifies other terms in the contract, as it does here with "efforts," the Fifth Circuit has held that "it is used . . . to designate that specific [efforts] . . . that would be thought satisfactory to the offeror by a reasonable man in the position of the offeree."  *Ergon-W. Virginia, Inc. v. Dynegy Mktg. & Trade*, 706 F.3d 419, 425 (5th Cir. 2013) (cleaned up).  This determination requires consideration of "the circumstances of the case, including the nature

---

[66]    R. Doc. 36-2, Exhibit A at 2.
[67]    *Id.*

of the proposed contract, the purposes of the parties, the course of dealing between them, and any relevant usages of trade." *Id.* (cleaned up).

GOL argues that it made all reasonable efforts to collect on SEACOR's invoices. The Brokerage Agreement did not specify a date by which GOL was required to obtain "provisions for payment" from Cox. The Court thus looks to the actions that GOL took to determine if it met its obligation. Before Cox filed for bankruptcy relief, GOL employees sought payment from Cox of unpaid invoices[68] and filed liens on SEACOR's behalf.[69] GOL also points to its continued efforts to collect for SEACOR after Cox filed for bankruptcy relief. Once Cox filed for bankruptcy relief, GOL preserved those liens in the Cox bankruptcy proceeding.[70]

SEACOR does not contest that GOL took these steps. Instead, SEACOR argues that there were additional steps that GOL could have taken. Importantly, however, SEACOR identifies no specific steps GOL could have taken or what would constitute "all reasonable efforts." SEACOR does not even allege or argue that GOL failed to use "all reasonable efforts" post-bankruptcy. Instead, SEACOR argues that "there were significant other" unspecified steps that GOL could have taken pre-bankruptcy and that GOL

---

[68]    R. Doc. 48-1, Exhibit C at 24-27.

[69]    R. Doc. 36-2, Exhibit B.

[70]    *Id.*, Exhibit C.

failed to remit payment on SEACOR's invoices that it recovered post-bankruptcy.  SEACOR does not argue that GOL should have invited it to be a Third Party Vessel Interest, and even if it made such an argument the Court finds that such a step was not required under the circumstances to satisfy the obligation to make "all reasonable efforts."  "All reasonable efforts" does not mean all efforts, or efforts that were not a reasonable business decision.  GOL had no obligation to ask a vessel provider that had stopped providing Cox services months before Cox filed for bankruptcy if it would consider restarting services for Cox.  Moreover, SEACOR has pointed to no evidence that it would have agreed to do so if asked.  Instead, SEACOR argues it was not required to be a Third Party Vessel Interest to be entitled to payment from GOL under the Trade Agreement.

SEACOR has not rebutted any of the facts put forth by GOL regarding the sufficiency of its collection efforts.  SEACOR has pointed to no additional action that GOL could have taken to collect on SEACOR's invoices and has provided no industry standard that GOL has failed to meet.  The Court therefore finds that SEACOR has failed to raise an issue of material fact that GOL did not use "all reasonable efforts."

The Court grants GOL's motion for summary judgment and denies summary judgment for SEACOR on this claim.

## B. Fiduciary Duty to Account

The Fifth Circuit looks to the Restatement of Agency for guidance on general agency law. *Port Ship Serv., Inc.*, 800 F.2d 1418, 1420 (5th Cir. 1986) (citing *Lubbock Feed Lots, Inc. v. Iowa Beef Processors*, 630 F.2d 250, 275-76 (5th Cir. 1980)). The Restatement (Third) of Agency provides: "An agent has a duty, subject to any agreement with the principal, . . . to keep and render accounts to the principal of money or other property received or paid out on the principal's account." § 8.12 (2006). Given the relationship between the parties, the Court finds that any accounting duty that GOL owes SEACOR is limited in scope to payments received or earmarked for SEACOR.

As explained more fully above, the $13 million that Cox paid GOL during the Chapter 11 bankruptcy does not constitute payments on SEACOR's invoices. SEACOR was not a party to the Trade Agreement that allowed for the $13 million payment, none of the $13 million was earmarked for SEACOR's invoices, and SEACOR, as a non-essential vendor, was not eligible to be paid on prepetition claims. GOL therefore owes SEACOR no accounting duty on this money.

The Court grants GOL's motion for summary judgment and denies summary judgment for SEACOR on this claim.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS defendant's motion for summary judgment and DENIES plaintiff's request for summary judgment in its favor.

New Orleans, Louisiana, this  16th  day of September, 2025.


_Sarah Vance_
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE