# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 15, 2026

Thomas B. Plunkett, III
Clerk

---

No. 26-30021

---

SEACOR MARINE, L.L.C.,

*Plaintiff—Appellant*,

*versus*

GOL, L.L.C.,

*Defendant—Appellee*.

---

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:24-CV-2409

---

Before SMITH, HAYNES, and ENGELHARDT, *Circuit Judges*.

PER CURIAM:

After an offshore oil and gas producer went bankrupt, the bankruptcy court allowed it to pay $13 million from its bankruptcy estate to GOL, in part based on money it owed to SEACOR. The district court granted GOL summary judgment, finding that GOL wasn't required to pay any of these funds to SEACOR. We REVERSE and REMAND.[1]

---

[1] Judge HAYNES states: I concur in reversing and remanding to conduct a trial on the genuine issues of material fact presented and the evidence in full to determine whether SEACOR's claims were at all part of the money GOL received. However, I would hold that

I.

Plaintiff–Appellant SEACOR Marine, L.L.C. (“SEACOR”) owns and operates marine vessels that it charters to oil and gas companies engaged in offshore exploration and production operations. Defendant–Appellee GOL, L.L.C. (“GOL”) is a broker that connects vessel owners with oil and gas companies in need of a charter. In 2018, SEACOR and GOL entered into a Brokerage Agreement, under which SEACOR “appoint[ed] [GOL] as [SEACOR’s] agent solely for the purpose of obtaining charters for [SEACOR’s] vessels.”

Charterers could pay either SEACOR or GOL. If a charterer paid GOL, GOL was required to “remit net charter hire (charter hire less Broker’s fee) to [SEACOR] within fifteen (15) business days.” GOL was also obligated to “undertake all reasonable efforts to collect charter hire from the Charterer,” but GOL itself could not be held “responsible to [SEACOR] for the Charterer’s non-payment.”

Pursuant to the Brokerage Agreement, GOL brokered SEACOR’s vessels to Cox Operating, LLC (“Cox”). SEACOR invoiced GOL $2.7 million for its services. GOL then invoiced Cox for that amount plus its roughly $90,000 brokerage fee.

Cox never paid and soon filed for bankruptcy. At the time of Cox’s filing, GOL estimated that Cox owed it approximately $24.8 million. However, “at least 95% . . . of this amount consisted of the claims” of vessel owners on whose behalf GOL operated as a broker, including SEACOR. *R&R Boats, Inc. v. GOL, LLC*, No. 2:24-CV-1875, 2026 WL 352786, at *3 (E.D.

---

SEACOR is not entitled to the entire amount it gave because GOL lost 24.8 million dollars and received only 13 million dollars from Cox. So, at most, SEACOR could receive only about 52 percent (about 1.4 million dollars).

La. Feb. 9, 2026). GOL admits that it included the $2.7 million Cox owed SEACOR in its claim. GOL and SEACOR later filed separate proofs of claims in the bankruptcy court, and they both filed liens to secure payment for SEACOR's services.

Shortly after filing for bankruptcy, Cox asked the bankruptcy court to allow it to pay certain creditors' prepetition claims, in the hope that those creditors would prospectively provide services that would enable Cox to continue operating during bankruptcy. Cox explained that "a failure to pay at least a portion of the prepetition amount due with respect to the Essential Vendor Activities . . . would likely result in the cessation of Essential Vendor Activities," and "any interruption of the Essential Vendor Activities would significantly diminish [Cox's] ability to achieve [its] goals in the Chapter 11 Cases." Cox promised to "pay Essential Vendor Obligations . . . only to the extent necessary to preserve [its] business[] and only to the extent that Vendors receiving such payments agree to continue providing goods and services on trade terms that are the same or better than the trade terms that existed immediately prior to the Petition Date . . . ."

In plain English, Cox sought permission to pay certain vendors out of its bankruptcy estate on the condition that those vendors continue to work with Cox during its Chapter 11 proceedings. The bankruptcy court gave it permission, allowing Cox to pay "accrued and outstanding prepetition Oil and Gas Obligations in the ordinary course of business in the amounts, categories, and manners described in [Cox's] Motion." It permitted Cox to require payees to do business with Cox on equal or better terms than before. And it empowered Cox to use its "sole discretion" to determine whether any payee had failed to provide such terms. If a payee did so, Cox could "deem such payment to apply instead to any postpetition amount that may be owing to such payee or treat such payment as an avoidable postpetition transfer of property."

Pursuant to the bankruptcy court's order, Cox and GOL soon entered into a Trade Agreement, under which Cox agreed to pay $13 million "towards GOL's [$24.8 million] Prepetition Claim" in exchange for GOL's continuing to provide services to Cox. The Trade Agreement recognized that "GOL has regularly provided, and may continue to provide, the services of vessels owned and operated by third-party vessel owners and operators," and it defined the vessel owners "who agree[d] to continue providing vessels" as "Third-Party Vessel Interests." The Agreement further stated that "[t]he inability of Third-Party Vessel Interests to provide services to GOL or [Cox] shall not be a default by GOL under this Trade Agreement provided, however, that GOL agrees to supply the same or commercially equivalent fleet of vessels to [Cox.]" The Agreement required GOL to apply the $13 million to, *inter alia*, "any amount secured by a lien."

GOL didn't pay any of the $13 million to SEACOR, so SEACOR sued, alleging that GOL breached the Brokerage Agreement between the two parties and its fiduciary duties by failing to use "all reasonable efforts" to collect from Cox and by refusing to pay SEACOR out of the $13 million prepetition payment. SEACOR also sought an accounting of GOL's dealings with Cox.

During discovery, SEACOR learned that GOL had used the $13 million to pay itself and closely related entities, with only a small portion's going to two independent vessel owners. GOL paid out the $13 million as follows:

| **Payee** | **Prepetition Claim** | **Amount Paid** | **Ownership**[2] |
|---|---|---|---|
| GOL | $520,000[3] | $1,643,468.58 | 50% Chaddock<br>40% Broussard<br>10% Danos |
| REC Marine | $6,290,423.11 | $7,800,000<br>($5,000,000 as a loan) | 100% Chaddock |
| Lafourche Tugs | $291,876 | $738,288<br>($463,288 as a loan) | 100% Danos |
| RO Boats | $0 | $495,000 as a loan | 50% Chaddock<br>50% Broussard |
| Barry Graham & EBI | $5,697,864.26 | $2,323,243.42 | |

GOL, using funds meant solely to "pay[] prepetition claims," paid itself more than triple its own alleged claim. And it paid roughly $9 million more to entities owned by GOL's three co-owners.

GOL nonetheless moved for summary judgment, arguing that it did not violate any of its obligations to SEACOR. The district court agreed. It found that (1) GOL was never paid for SEACOR's invoices, so it did not have to remit payment to SEACOR; (2) the Trade Agreement prohibited GOL from using the money to pay SEACOR because SEACOR did not continue providing services to Cox; and (3) even if the Trade Agreement did not prevent GOL from paying SEACOR, nothing required it to do so.[4] The

---

[2] Ronald Chaddock was GOL's president at the time. REC Marine, RO Boats, and Lafourche Tugs all share office space with GOL. GOL employees "often provide operational support" to REC Marine, and GOL shares a general counsel with RO Boats. And all three are owned, in varying proportions, by Chaddock and GOL's two other owners, Joel Broussard and Todd Danos.

[3] SEACOR estimated this amount based on GOL's typical 4% brokerage fee.

[4] In another case with nearly identical facts, Judge Fallon found that "GOL breached its implied duties as agent by obtaining the $13 million partially on the basis of R&R Boats' claim and then distributing the sum without the notice or consent of R&R

district court also held that GOL complied with its obligation to take "all reasonable efforts" to collect the unpaid charter hire from Cox. Accordingly, it determined that GOL did not breach its duties, so it dismissed SEACOR's claims. SEACOR moved for reconsideration, but the court denied that motion. SEACOR timely appealed.

II.

This dispute concerns a maritime contract, so the district court had jurisdiction under 28 U.S.C. § 1333. We have appellate jurisdiction under 28 U.S.C. § 1291.

"We review a district court's grant of summary judgment *de novo*, applying the same standards as the district court." *Earnest v. Palfinger Marine USA, Inc.*, 90 F.4th 804, 808 (5th Cir. 2024) (quoting *Huskey v. Jones*, 45 F.4th 827, 830 (5th Cir. 2022)). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When assessing the record, this court must view the evidence introduced and all factual inferences from the evidence in the light most favorable to the party opposing summary judgment." *Ford v. Mckesson*, 171 F.4th 332, 338 (5th Cir. 2026) (citation and internal quotation marks omitted). The "judge's function" at the summary judgment stage is not to "weigh the evidence and determine

---

Boats." *R&R Boats, Inc. v. GOL, LLC*, No. 2:24-CV-1875, 2026 WL 352786, at *6 (E.D. La. Feb. 9, 2026). Judge Fallon also assumed that R&R Boats was entitled to a share of the $13 million equal to the portion of GOL's total $24.8 million prepetition claim that was based on R&R Boats' invoices. *Id.* (awarding R&R Boats $1,430,000, which "constitute[d] 11% of the $13 million that GOL received from Cox, in recognition of the fact that the $2,815,561.40 balance owed to R&R under the Cox invoices constituted 11% of GOL's total prepetition claim"). GOL has appealed that decision.

the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

III.

SEACOR argues the district court erred in concluding that the Trade Agreement barred GOL from remitting payment to SEACOR and that, even if it didn't, the Brokerage Agreement didn't require SEACOR to do so. We begin with the Trade Agreement.

A.

GOL included the $2.7 million Cox owed SEACOR in its $24.8 million prepetition claim. Yet it gave SEACOR nothing when Cox paid $13 million toward that claim. The district court nonetheless let GOL off the hook because it found that (1) GOL was not paid for SEACOR's services and (2) the Trade Agreement restricted GOL to remitting payment only to vendors that continued to provide services to Cox. Both conclusions are erroneous.

1.

The Trade Agreement between Cox and GOL recognizes that GOL had a prepetition claim of approximately $24.8 million, which GOL acknowledges included $2.7 million for unpaid SEACOR invoices. The Trade Agreement further states that Cox's $13 million payment was to go "towards GOL's Prepetition Claim," and it required GOL to apply the payment to "any amount secured by a lien."[5] GOL agrees that SEACOR's outstanding balance was secured by a lien.

[5] The Trade Agreement first prioritizes payments required "under section 503(b)(9) of the Bankruptcy Code," but there's no dispute that this category is irrelevant in this case.

Despite this, the district court rejected SEACOR's argument that GOL was paid for SEACOR's services. It concluded that there was no evidence the "funds received from Cox were to be allocated to SEACOR's invoices" or that "the $13 million was to apply pro rata to all invoices comprising the estimated $24.8 million prepetition claim." But even though Cox did not itemize its payment and specify that part of it was for SEACOR's services, the plain text of the Trade Agreement supports SEACOR's argument that Cox's payment was partially premised on SEACOR's invoices. The Trade Agreement plainly states that the $13 million was to pay off some of GOL's $24.8 million prepetition claim, which the parties agree included the $2.7 million Cox owed SEACOR. There is at least some evidence, then, that GOL received $13 million toward its prepetition claim because it included the money Cox owed SEACOR as part of that claim.

GOL argues SEACOR's position that its debt is "unpaid," and its filing of a proof of claim in the bankruptcy court for the $2.7 million, contradict its argument that a portion of the $13 million payment was for its services. But there is no inconsistency. SEACOR has not received any money for its services *because* GOL didn't pay SEACOR. Faced with the prospect of recovering nothing at all, SEACOR is sensibly pursuing repayment in the bankruptcy court in addition to this court.

Viewing the evidence in the light most favorable to SEACOR, there is at least a question of fact as to whether a portion of Cox's payment was for SEACOR's services. Summary judgment for GOL was therefore inappropriate.

2.

We now turn to the district court's conclusion that the Trade Agreement barred GOL from paying SEACOR because SEACOR did not "meet the requirements outlined by the Trade Agreement and the

Bankruptcy Order." To the district court, the "context" and "purposes" of the Trade Agreement indicated that "vendors/suppliers" like SEACOR "had to agree to continue providing Cox with essential services under Customary Trade Terms to receive any payment towards their prepetition claims." The court explained its view that the "Trade Agreement, Bankruptcy Order, and underlying Motion all make clear that the aim of paying prepetition claims pre-confirmation was to help Cox successfully reorganize," and "[t]his goal would be achievable only if the money that Cox was authorized to disburse was to entities that continued to provide, under Customary Trade Terms, the essential goods and services explicitly mentioned in the Bankruptcy Motion which was adopted in the Bankruptcy Order." The court reasoned that permitting GOL to pay SEACOR—which did not continue providing services to Cox—would undermine the Trade Agreement's "aim" of "induc[ing] parties to continue providing essential services to Cox during the bankruptcy proceedings." It accordingly found that GOL "did not have the discretion to use the money it received from Cox to pay SEACOR's invoices either in whole or in part."

This too is misguided. Nothing in the texts of the Trade Agreement, the Bankruptcy Order, or the Motion barred GOL from using a portion of the $13 million to pay off Cox's debt to SEACOR, in whole or in part. To the contrary, the Trade Agreement was clear that the payment was to go towards GOL's Prepetition Claim, and the Bankruptcy Order "authorized" Cox "to pay accrued and outstanding prepetition . . . [o]bligations," which included SEACOR's $2.7 million balance.

And contrary to the district court's view, the return promise to continue "supply[ing] goods and/or services" applied only to GOL—not to SEACOR or any other vendor. Although the Trade Agreement said GOL could satisfy its obligation by providing "the services of vessels owned and operated by third-party vessel owners and operators," it did not restrict GOL

to remitting payment only to those parties, and it did not require that vessel owners continue providing their vessels. In fact, the Trade Agreement specified that "[t]he inability of Third-Party Vessel Interests to provide services to GOL or [Cox] shall not be a default by GOL."

The district court's emphasis on the "purpose" and "aim" of the Trade Agreement contravenes the rule that "a court should not look beyond the written language of the contract to determine the intent of the parties unless the disputed language is ambiguous." *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214 (5th Cir. 1986). Here, the plain text of the Agreement did not at all prohibit GOL from remitting payment to SEACOR. It was therefore inappropriate to grant summary judgment to GOL by looking beyond the contract to its alleged context and purposes.

Regardless, the purposes and aims of the Trade Agreement do not require reading in an implicit restriction on who GOL can pay. Cox's bankruptcy interests would not be hindered if GOL applied a portion of the $13 million to SEACOR's invoices because GOL would still be contractually bound to continue providing services to Cox, even if SEACOR provided no ships. Any hardship from requiring GOL to use some of the prepetition payment to pay off Cox's debt to SEACOR would fall on GOL, which was required to provide ships to Cox regardless of whether certain owners stopped supplying their vessels. GOL signed the Trade Agreement knowing its obligations to SEACOR, and "[c]ourts will not rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained." *ExxonMobil Corp. v. Elec. Reliability Servs., Inc.*, 868 F.3d 408, 415 (5th Cir. 2017) (citing Texas law).

In conclusion, there is at least a factual question as to whether Cox paid any part of SEACOR's invoices when it paid $13 million toward GOL's prepetition claim. Further, the Trade Agreement required only GOL to

continue providing services, and it did not restrict GOL from using a portion of the $13 million to repay SEACOR, even though SEACOR did not continue providing services to Cox.[6] The district court erred in concluding otherwise.[7]

B.

Since nothing in the Trade Agreement prevented GOL from paying SEACOR, the next question is whether it was required to do so under GOL and SEACOR's Brokerage Agreement. The Brokerage Agreement imposes two relevant duties upon GOL: (1) it is required to "remit net charter hire . . . to [SEACOR] within fifteen (15) business days after receipt of such charter hire from the Charterer"; and (2) it must "undertake all reasonable efforts to collect charter hire from the Charterer."

As to the first obligation, as explained above, there is a genuine dispute about whether any part of the $13 million prepetition payment was for SEACOR's invoices. If it was, then GOL breached its duty by failing to remit payment to SEACOR within fifteen days. Accordingly, summary judgment on this issue was improper.

As to the second obligation, SEACOR contends the Brokerage Agreement created a principal–agent relationship between itself and GOL. GOL had a corresponding obligation to act as SEACOR's fiduciary,

---

[6] SEACOR contends that it did not "refuse" to provide services to Cox, just that it was never asked to do so. Because the Trade Agreement did not limit GOL to repaying only vessel owners that continued to provide services, the court need not decide whether the district court erred in holding that SEACOR refused to supply vessels to Cox.

[7] The district court cited three bankruptcy court decisions for the idea that the bankruptcy code "ordinarily does not allow for the pre-confirmation payment of pre-petition debts." But the bankruptcy court here did, and the terms of its order did not bar GOL from paying SEACOR.

SEACOR argues, which GOL violated by treating SEACOR unfairly and by self-dealing.

"Federal maritime law embraces the principles of agency." *W. India Indus., Inc. v. Vance & Sons AMC-Jeep*, 671 F.2d 1384, 1387 (Former 5th Cir. 1982). "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01 (A.L.I. 2006).[8] "A person manifests assent or intention through written or spoken words or other conduct." *Id.* § 1.03.

Here, the district court determined that GOL was SEACOR's agent for the "limited purpose of obtaining charter hire," a point GOL concedes.[9] As SEACOR's agent, GOL owed SEACOR "a fiduciary duty to act loyally for [SEACOR's] benefit in all matters connected with the agency relationship," Restatement (Third) of Agency § 8.01 (A.L.I. 2006), which included "a duty not to acquire a material benefit from a third party in connection with transactions conducted or other actions taken on behalf of the principal or otherwise through the agent's use of the agent's position," *id.* § 8.02, and a duty "not to use property of the principal for the agent's own purposes or those of a third party," *id.* § 8.05(1). GOL also had "a duty

---

[8] This court looks to the *Restatement (Third) of Agency* for guidance on agency law. *See Port Ship Serv., Inc. v. Int'l Ship Mgmt. & Agencies Serv., Inc.*, 800 F.2d 1418, 1420 (5th Cir. 1986) (per curiam); *Randle v. Crosby Tugs, L.L.C.*, 911 F.3d 280, 285 (5th Cir. 2018) (per curiam).

[9] By including in its prepetition claim SEACOR's outstanding invoices, GOL was acting on SEACOR's behalf. The district court may be correct that GOL "made all reasonable efforts to collect on SEACOR's invoices" when GOL sought repayment pre-bankruptcy, filed and perfected liens, and continued seeking repayment after Cox filed for bankruptcy. But regardless of GOL's efforts, once it received money to which SEACOR was arguably entitled, it did not repay SEACOR.

to act in accordance with the express and implied terms of any contract between the agent and the principal," *id.* § 8.07, and duties "not to mingle the principal's property with anyone else's" and "to keep and render accounts to the principal of money or other property received or paid out on the principal's account," *id.* § 8.12(2)–(3).

The district court held that GOL did not violate any duty it owed SEACOR because "GOL has not received payments on SEACOR's invoices, nor received payments that should have been disbursed to SEACOR under the Trade Agreement." But as we have explained, the $13 million prepetition payment arguably was for at least some of Cox's debts to SEACOR. Either way, nothing in the Trade Agreement prevented GOL from remitting a portion of the payment to SEACOR. Accordingly, whether GOL was required to pay SEACOR as SEACOR's fiduciary raises genuine disputes of material fact and law. Summary judgment on this issue was improper.

*　　*　　*

We REVERSE and REMAND for further proceedings consistent with this opinion.